AMERICAN GENERAL CORPORATION, a Texas corporation, and American General Life Insurance Company, a Texas corporation, Plaintiffs,

v.

CONTINENTAL AIRLINES CORPORATION, a Delaware corporation, and Texas Air Corporation, a Delaware corporation, Defendants.

Civ. A. No. 8390.

Court of Chancery of Delaware, New Castle County.

Submitted: April 14, 1992.
Decided: May 14, 1992.

Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington, for plaintiffs.

Paul P. Welsh, Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants.

HARTNETT, Vice Chancellor.

In 1987 this Court found that the defendants, Continental Airlines Corporation ("Continental") and Texas Air Corporation ("Texas Air"), had breached a provision in an 1983 Loan Agreement between American General and Continental that provided that American General was entitled to receive the same stock option that was given to the employees of Continental as part of the 1987 merger between Continental and its majority stockholder Texas Air Corporation, ("the Employee Option"). After trial on the issue of the amount of damages to be awarded because of the breach the Court finds that plaintiffs are entitled to an award of $44,804,218 plus interest measured from May 20, 1987 at a rate of 5% over the Federal Reserve discount rate on that date.

I

The background of this litigation is set forth in detail in *American General Corp. v. Texas Air Corp.*, Del.Ch., C.A. Nos. 8390, 8406, 8650 and 8805, Hartnett, V.C., 1987 WL 6337 (Feb. 5, 1987) and *American General Corp. v. Continental Airlines Corp.*, Del.Ch., C.A. No. 8390, Hartnett, V.C., 1988 WL 7393 (Jan. 26, 1988), *aff'd*, Del.Supr., 575 A.2d 1160 (1990).

American General Corporation and American General Life Insurance Company (collectively "American General") began their involvement in Continental Airlines Corporation ("Continental") on June 10, 1983 when they entered into a loan agreement ("Loan Agreement") with the then struggling airline. The Loan Agreement provided that American General would lend $40 million to a subsidiary of Continental in exchange for: (1) $40 million worth of 11% Senior Notes of the subsidiary due in 1998; (2) a separate written guaranty by Continental securing the debt; (3) an anti-dilution option provision that would allow American General to acquire 25% of any future stock issue of Continental occurring during the following 10 years; and (4) warrants that would permit American General to acquire within 5 years approximately 5 million shares of Continental common stock at an exercise price of $8.50 per share. The exercise price and the expiration terms of the warrants were changed during the pendency of this litigation so that American General had until June 10, 1989 to buy the same number of pre-merger Continental shares at a warrant exercise price of $8.30.

On September 24, 1983, Continental sought Chapter 11 bankruptcy protection. When Continental emerged from the bankruptcy proceedings on September 7, 1986, it had so substantially reduced operating costs that it was considered to have the lowest operating costs of any domestic air carrier.

In July of 1985, while Continental was still in bankruptcy, Texas Air Corporation ("Texas Air"), which owned approximately 72% of Continental's stock, proposed to take Continental private. Although the terms of the merger changed throughout negotiations, each version of the transaction gave Continental employees the opportunity to purchase shares of Texas Air, through an option or a direct exchange.

The final terms of the merger were established by agreement of Continental and Texas Air in December of 1986. The basic terms of the Merger Agreement provided that Continental would be merged with a wholly owned subsidiary of Texas Air formed to facilitate the merger, and Continental's minority stockholders would be cashed out at a price of $16.50 per share. Texas Air publicly announced a related proposal, not contained in the Merger Agreement itself, that Continental employee stockholders would receive, in addition to the $16.50 per share merger consideration, the opportunity to exchange their shares of Continental common stock for Texas Air common stock at an exchange ratio of 1 pre-merger Continental share for .8 share of Texas Air. Significantly, the primary beneficiaries of this exchange would be Francisco A. Lorenzo, who at that time was the Chairman of the Board of Directors of both Continental and Texas Air, and a few other key insiders.

Apparently realizing the discriminatory effect of the proposed employee exchange offer, Texas Air withdrew that offer and granted to Continental's employee stockholders an option to buy Texas Air stock ("Employee Option"). The Employee Option was to be exercisable in August of 1988 and would allow the employee stockholders who continued to be employed by Texas Air to buy, for $16.50, .8 of a share of Texas Air for each share of pre-merger Continental stock that they owned between October 31, 1985 and February 6, 1987. This option was not set forth in the Merger Agreement, and it did not affect the $16.50 per share merger consideration that each employee stockholder would receive.

In December of 1986 American General filed suit in this Court seeking to enjoin the consummation of the merger on the grounds that the structure of the transaction discriminated among Continental's minority stockholders and that American General's contractual warrant rights would thereby be impaired. Three other minority stockholders filed class actions, also seeking an injunction, but doing so on behalf of Continental's minority stockholders other than American General.

On February 5, 1987, this Court denied the motion for a preliminary injunction, holding that an adequate remedy other than injunctive relief existed because any claimed unfairness of the merger was reflected in the price to be paid and could be challenged in an action for an appraisal or for damages. *American General Corp. v. Texas Air Corp.*, Del.Ch., C.A. Nos. 8390, 8406, 8650 and 8805, Hartnett, V.C., 1987 WL 6337 (Feb. 5, 1987). Texas Air completed the going-private merger the next day.

On March 13, 1987, the minority stockholders other than American General settled their class action suits in consideration of receiving an extra $3.75 per share. Pursuant to the settlement, the employee stockholders were precluded from receiving the additional $3.75 if they chose to exercise their employee option to purchase the .8 share of Texas Air stock. An employee stockholder was therefore given the right to choose to receive either: (1) the $16.50 cash per share merger consideration plus the employee option; or (2) the $16.50 cash per share merger consideration plus the $3.75 cash per share settlement consideration.

On March 3, 1987, American General moved for partial summary judgment on the issue of whether the following language in the warrant provision in the Loan Agreement entitled American General to receive the same option as the employees were entitled to receive under the Employee Option:

"3.8 *Reorganization, Merger, etc.* If, after the date hereof, any capital reorganization or reclassification of the capital stock of the Company (except as provided in Section 3.5), or consolidation or merger of the Company with another corporation ... or the sale or conveyance of all or substantially all of its assets to another corporation shall be effected, then, as a condition of such reorganization, reclassification, consolidation, merger, sale or conveyance, lawful and adequate provision shall be made whereby the holder hereof shall thereafter have

the right to purchase and receive upon the same basis and upon the terms and conditions specified in this Warrant and in lieu of the shares of the Common Stock of the Company immediately theretofore purchasable and receivable upon the exercise of the rights represented hereby, such shares of stock, securities or property as may be issued or payable with respect to or in exchange for a number of outstanding shares of such Common Stock equal to the number of shares of such Common Stock purchasable and receivable upon the exercise of the rights represented hereby immediately prior to such reorganization, reclassification, consolidation, merger, sale or conveyance...."

American General argued that this language entitled it to receive the Employee Option with respect to the shares of pre-merger Continental stock that it could have purchased pursuant to its warrants.

Texas Air countered by moving for summary judgment that it had not violated any contractual provision contained in the warrants. Texas Air also asserted that the issue would become moot if the Court were to find that American General was entitled to the Employee Option because the Texas Air Board and stockholders had recently amended the Employee Option to include a self-destruct mechanism that would void the option upon such a judicial finding.

In response to the cross-motions for summary judgment, this Court held, *inter alia,* that American General was entitled to receive the Employee Option. *American General Corp. v. Continental Airlines Corp.*, Del.Ch., C.A. No. 8390, Hartnett, V.C., 1988 WL 7393 (Jan. 26, 1988). This ruling was based on section 3.8 of the warrants, the language of which was interpreted to mean that American General had the right to receive the same consideration that *any* other stockholder received in a merger. *Id.* Despite the fact that Texas Air had gone to great lengths to restructure the Employee Option so that it appeared to be unrelated to the merger, this Court held that the option was clearly part of the merger consideration. *Id.*

The Delaware Supreme Court affirmed, *inter alia,* this Court's ruling that the Employee Option was merger consideration and that American General was therefore entitled to that option under section 3.8 of the warrants. *Continental Airlines Corp. v. American General Corp.*, Del.Supr., 575 A.2d 1160 (1990). Because the Employee Option was merger consideration, the Supreme Court held that it could not be withdrawn via the self-destruct mechanism inserted by Texas Air. To allow such an attempt to succeed would be, according to the Supreme Court, to allow Texas Air to manipulate the Delaware courts and to render their decisions mere advisory opinions. The self-destruct mechanism was therefore held to be impermissible. *Id.* at 1169.

During the pendency of this litigation, the market price of Texas Air stock declined significantly. Shortly after the merger, in February of 1987, the price peaked at about $50 per share. Later that year, however, the price began to decline and the general market decline in October of 1987 depressed the price further. During the entire six month exercise period for the Employee Option (beginning on August 6, 1988), Texas Air stock traded below the $20.625 (per full Texas Air share) exercise price. Ultimately, Texas Air's financial condition worsened, and both Texas Air and post-merger Continental are now in the midst of bankruptcy proceedings.

While the appeal in the Supreme Court was pending on this Court's grant of summary judgment to American General, the warrants expired. The issue before this Court at trial, therefore, is limited to a determination of the damages that American General suffered (if any) because of defendants' failure to make provisions for American General to receive the same option that the employees received.

## II

■ In their post-trial brief, defendants raise for the first time the argument that there has been no judicial finding that any breach of the terms of American General's warrants occurred. They contend that this Court's grant of summary judgment to

American General and the Delaware Supreme Court's affirmance of that judgment amounted to nothing more than a declaration of American General's contractual rights. Because there was no express language in either of those opinions stating that defendants had breached American General's warrant rights, defendants assert that a finding that they were not in breach of the warrants would be entirely consistent with this Court's and the Supreme Court's prior holdings.

Defendants exalt form over substance with their contention that this Court did not find that a breach of American General's contractual rights had occurred. Implicit in this Court's holding that American General was entitled to receive the Employee Option as merger consideration is the holding that defendants breached that contractual right by not providing American General with that merger consideration. Furthermore, the trial was limited to an ascertainment of American General's damages as provided in the Pre–Trial Order. This would not have occurred if the Court had not already determined that a breach had occurred. There is no merit, therefore, to defendants' claim that there has been no ruling on the issue of their breach of the terms of American General's warrants.

### III

Defendants next contend that if they have breached the terms of American General's warrant rights, the breach could not have occurred until American General first attempted to exercise its warrants in May of 1988. If American General had been able to exercise its warrants in May of 1988 it would have been entitled to over 5 million shares of pre-merger Continental. The number of options an employee stockholder could have obtained depended on the number of pre-merger Continental shares he owned. Defendants therefore reason that American General could not have become entitled to the same option as the employees received until it perfected its right to the pre-merger Continental shares through the exercise of its warrants. Because the price of Texas Air stock had declined below

the option exercise price by the time American General tried to exercise its warrants in May of 1988, defendants conclude that American General suffered no damages because of the breach of the terms of the warrants by defendants.

American General, however, was not required to actually exercise its warrants to establish defendants' breach. The exercise of the warrants was not a condition precedent to defendants' duty to grant American General the same option as it granted to its employees. As noted above, defendants breached section 3.8 of the warrants portion of the Loan Agreement by not performing their contractual duty to provide that American General would receive the same options as the employees received.

Even if American General had been required to exercise its warrants as a condition precedent under section 3.8 of the warrants portion of the Loan Agreement, American General's failure to do so would have been excused. Continental Airlines' General Counsel, by a letter dated May 10, 1988, informed American General that "[t]o exercise validly you must surrender the Warrants completely, including all ownership rights—such as, for instance, the right to enforce purported further claims under the Warrants." When American General attempted to exercise the warrants without releasing its claim to the Employee Option, defendants refused to honor the exercise. Indeed, defendants concede in their post-trial brief that they would have refused to acknowledge American General's right to the Employee Option regardless of when American General tried to exercise its warrants.

Defendants therefore cannot claim that American General's exercise of the warrants was necessary to put defendants in breach of the 1983 Loan Agreement when the defendants interfered with that performance by requiring American General to simultaneously release a valuable contract right. *T.B. Cartmell Paint & Glass Co. v. Cartmell*, Del.Super., 186 A. 897 (1936). *See also Christophersen v. Blount*, 216 Conn. 509, 582 A.2d 460 (1990).

## IV

■ The most difficult issue to determine is what date is to be used in assessing damages. Defendants contend that if the Court finds that damages are appropriate, they should be determined as of May 20, 1987, the day 90% of the voting Texas Air stockholders approved the Employee Option. Because the option could have been rejected by the stockholders up until the stockholder vote, defendants claim American General would not have had "even a future right" to the option before that date.

American General counters that the date to be used in computing damages should be February 6, 1987, the date of the merger, because the Employee Option, although subject to being later ratified, was merger consideration granted to the Continental employee stockholders as of that date. American General considers the necessary Texas Air stockholder approval to have been a mere "rubber stamp" process because of the overwhelming majority approval the plan actually received and the fact that management controlled over 50% of the voting stock. American General also points to the fact that one of the plan's primary beneficiaries, Francisco Lorenzo, had significant voting power in and influence over Texas Air. According to American General, it would be highly unlikely that he would vote against the option plan in light of the potential gains he would have received as a participant. All of this is mere speculation, however.

The breach of American General's contractual right to the options occurred on the date of the merger—February 6, 1987—not on the date of the Texas Air stockholder meeting, as argued by defendants. The language in the warrant provision of the Loan Agreement states that "as a condition of such ... merger ... lawful and adequate provision shall be made" for American General to receive the same merger consideration as any other stockholder. At the outset the employee stockholders were made eligible for the contingent option plan, but American General was not. Defendants therefore breached the warrant provision upon the completion of the merger because they failed to meet the contractual provision that American General would receive the same merger consideration that the employee stockholders received—the Employee Option with its contingent nature.

Nevertheless, although defendants were in breach of American General's contractual rights as of the date of the merger, it would not be equitable to measure damages from that date. Defendants are correct in their contention that damages should be measured from the date on which the Texas Air stockholders approved the Employee Option and the contingent nature of the options was removed—May 20, 1987. As defendants point out, the approval of the Texas Air stockholders was necessary for the implementation of the option plan. Until it was actually approved, the Employee Option was contingent in nature and could have become a nullity. Without that approval, the employee stockholders would have received only the $16.50 cash-out merger consideration.

The language of the warrants provision of the Loan Agreement stated that "adequate provision shall be made whereby [American General] shall [after the merger] have the right to purchase ... such ... property that may be *issued or payable* with respect to ... a number of outstanding shares" (emphasis added). Section 3.8 of the Warrant provision of the Loan Agreement. The breach occurred when "adequate provision" was not made for American General to be eligible to be issued the Employee Option, but damages did not accrue at that time because the option was not "issued or payable" until it was actually approved by the stockholders on May 20, 1987. American General was entitled to receive only what the warrant provision of the Loan Agreement contractually provided that it was to receive: options when issued or payable.

American General's argument that it could have sold the right to receive the contingent options is too speculative to be given serious consideration.

8

American General's further argument that even on the date of the merger the stockholder approval was a virtual certainty, as borne out by the actual stockholder vote, is of little consequence in determining the date from which American General's damages should be measured. It is mere speculation to say that with all the benefits they stood to receive, Lorenzo and the other insiders would never defeat the Employee Option. If prior to the stockholder vote conditions had changed in such a way as to eliminate those benefits for the management beneficiaries, Lorenzo and the other insiders would likely have used their significant influence to sway the vote against the plan.

Although the defendants breached American General's contractual rights on the date of the merger by failing to make American General eligible to receive the Employee Option when and if approved by the stockholders, American General had no right to actually receive the options until they were issued or payable. The date for measuring damages should, therefore, be May 20, 1987, the date the stockholders approved the option plan and American General became absolutely entitled to be issued the options. American General's damages will therefore be measured from that date.

V

The facts in this matter are unique and therefore there is no clear precedent to measure the damages. At best, the existing precedents, by analogy, merely point the way to a fair measure of damages. Plaintiff has requested $91,759,037 in damages plus interest from February 6, 1987. Defendant claims no damages should be awarded.

■ In a breach of contract action, a plaintiff's damages are generally measured by what is necessary to put it in as good a position as it would have occupied had there been full performance of the contract. *J.J. White, Inc. v. Metropolitan Merchandise Mart*, Del.Super., 107 A.2d 892 (1954).

■ American General asserts that there are two alternative measures of damages that would put it in the position it would have occupied if there had been full performance. The first measure of damage it advocates is a sum equal to the difference between the value of the warrants on the date of the breach and their value on the date of the trial. A more fact specific variation based on the same concept is that the damage is a sum equal to the difference between the value of the warrants on the date of the breach, (or their highest value during a reasonable time after the breach), if the defendants had not breached the Agreement, and the actual value of the warrants on that date in light of defendants' breach.

The second measure of damages advocated by American General is a variation of the damage formula used in cases involving the conversion of securities of fluctuating value. Under that formula the damage would be based on the highest market price the stock reached within a reasonable time of plaintiff's discovery of the breach. American General, however, asserts a modified version of this damage formula in order to reflect the difference in value of American General's warrants with and without the Employee Option, shortly after the breach.

While none of the formulas suggested are adequate to give a truly accurate measure of American General's damages, the better approach is a variation of the formula used in conversion cases. This approach, however, must reflect that the "highest intermediate value" should be determined from May 20, 1987, the date the contingency factor was removed from the options, not the date of the initial breach—February 6, 1987, the date of the merger.

VI

Defendants' objections to the use of the conversion formula of damages are without merit. First, defendants maintain that the "highest intermediate value" formula is not an appropriate measure of damages in this case because defendants did not interfere with American General's ability to sell its

warrants. Secondly, defendants contend that American General failed to prove that it would have sold its warrants during the time period following May 20, 1987. Defendants also assert that American General should receive no damages because there was never a time when the employee stockholders could have exercised their options and received a financial gain. Finally, defendants claim that American General failed to mitigate its damages. None of these defenses have merit.

## VII

Defendants first contend that American General has inappropriately advocated "the highest intermediate value" formula as the measure of damages despite that it is the most commonly employed measure of damages in conversion cases. Defendants cite *Loretto Literary and Benevolent Institution v. Blue Diamond Coal Co.*, Del.Ch., 444 A.2d 256 (1982), as a basis of its claim that the conversion standard of damages should not be applied if the plaintiff was able to transfer the subject stock at all relevant times. Defendants also argue that *Loretto* imposes a burden on a plaintiff in a conversion case to show that he would have sold his stock during the time period on which he bases his damage calculation. Defendants argue that because American General was always able to sell its warrants, but apparently did not attempt a sale, it is precluded from claiming the "highest intermediate value" for its damages.

In their application of the *Loretto* holding to the facts of this case, defendants have disregarded the effect of their denial to American General of its right to the Employee Option. While American General always had the legal ability to sell its warrants, defendants' breach certainly interfered with the salability of the warrants as a practical matter. With the legal right to the Employee Option in dispute, American General could not have realized the full value of the warrants—assuming it could have found a willing buyer at all. Because defendants' breach did interfere with the alienability of the warrants, the application of the conversion measure of damages to this case is consistent with the holding in *Loretto*.

Moreover, *Loretto* cannot fairly be construed as imposing a burden on the plaintiff in a conversion case to prove that he would have sold his stock during the period for which he claims damages. This Court specifically held in that case that a theory of conversion was unavailable and the plaintiff was limited to its actual loss occasioned by the delay in the recordation of transfers of plaintiff's shares. The only reason the *Loretto* Court considered the issue of whether plaintiff intended to sell the stock during the period of delay was to ascertain whether plaintiff had been prevented from consummating such a sale. Because American General's ability to sell its warrants and realize their full value was clearly undermined by defendants' breach, the issue of damage must be resolved without resort to an inquiry into plaintiff's intent.

## VIII

Defendants also argue that American General should not recover any damages because it would not have sold its warrants during the period when Texas Air was trading at prices that would make such a sale attractive. Defendants quote at length American General's statements at both the preliminary injunction and summary judgment stages of this litigation that it sought continuing equity participation in Texas Air. Defendants also place great emphasis on statements made at trial by American General's Chief Executive Officer, Mr. Hoos, that although he did not attempt a sale of the contingent warrants during 1987, in hindsight, he would have recommended to American General that it should have liquidated its position in the defendant corporations if the existence of the option was not being challenged by defendants.

Defendants have essentially restated in a more factual context their contention that American General must prove that it would have sold its warrants during the period for which it claims damages. As was stat-

ed above, American General does not have such a burden of proof.

■ The hallmark of conversion cases is the interference with the plaintiff's ability to transfer securities he owns or to which he is entitled. The injury that the plaintiff suffers is the deprivation of his range of elective action, and by applying the conversion measure of damages a court endeavors to restore that range of elective action. *In re New York, N.H. & H.R. Co.*, D.Conn., 64 F.Supp. 487, 491 (1945). To require the plaintiff to show that he would have sold his securities, had he been able, is to require him to prove that he would have taken the "very steps" that defendant's "wrongful act ... precluded him from taking...." *Kaufman v. Diversified Industries, Inc.*, 2d Cir., 460 F.2d 1331, 1336 (1972).

The defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable. Because it is the defendant who creates this uncertainty, "fundamental justice requires that, as between [the plaintiff] and [the defendant], the perils of such uncertainty should be 'laid at defendant's door.' " *Madison Fund, Inc. v. Charter Co.*, S.D.N.Y., 427 F.Supp. 597 (1977), quoting *Kaufman v. Diversified Industries, Inc.*, 2d Cir., 460 F.2d 1331, 1338 n. 8 (1972).

In the present case, the Court is faced with the same uncertainty that confronted the courts in the *Madison Fund* and *Kaufman* decisions. American General in 1986 did ask this Court to enjoin the merger in order to permit it to enjoy a continuing equity interest in Texas Air because it claimed the freeze-out merger was an attempt to keep it from realizing a profit on its investment in and relationship with pre-merger Continental. However, that request for continuing equity participation was reconcilable with the concept of having been able to sell the warrants with the option attached because through such a sale American General could have realized that profit.

Moreover, there is some credibility in American General's "hindsight" claim that it would have liquidated its warrant holdings if the entitlement to the Employee Option had not been under challenge. It is clear that by 1987 the relationship between American General and Continental had become strained. Mr. Hook testified that the structure of the merger, as well as Texas Air's planned acquisitions of three troubled airlines, caused him to doubt Mr. Lorenzo's commitment to a long-term relationship with American General. American General's confidence was also shaken when it learned that Texas Air insiders (most notably Francisco Lorenzo) sold large blocks of Texas Air stock from October 1986 through March 1987. Finally, in August of 1986, American General had implemented a new investment management policy of diversification that was incompatible with a large investment in any single corporation.

Having deprived American General of the ability to decide whether to hold or to dispose of its warrants with the Employee Option attached, defendants precluded an inquiry into American General's intent. Through their breach, the defendants assumed the risk that American General would have sold the warrants with the option attached when Texas Air stock was trading at relatively high prices if the right to the options was not disputed, and that they would have to compensate American General for the profits of any lost sale. They cannot, therefore, now claim that in order to recover damages American General must prove that it would have taken such action.

IX

Defendants also argue that American General should not recover any damages because the employee stockholders did not actually receive any financial benefit from the Employee Option. During the entire Employee Option exercise period (August 6, 1988 through February 6, 1989) Texas Air stock traded below the $20.625 (per full Texas Air share) option exercise price. Because the employee stockholders were apparently, therefore, unable to reap any fi-

nancial gain from their options, defendants contend that awarding American General damages would put American General in a better position than it would have occupied had there been no breach.

Defendants are correct in their contention that American General was entitled to the Employee Option only upon the same terms as were given to the employee stockholders. That fact, however, does not lead to the assumption that American General was required to have followed the same course of action as the employee stockholders and would have held its options until the exercise period. As was noted above, the Court cannot ascertain precisely what American General would have done if it had been issued the options, but that uncertainty must be resolved against defendants.

Furthermore, if American General had been properly issued the Employee Option on May 20, 1987, it would have owned options for a significant block of Texas Air stock. Such a large holding would have permitted it to sell its warrants with the options attached well before the exercise period. The fact that the employee stockholders did not hold securities (such as the warrants that American General held) that would have allowed them to sell their rights to the otherwise inalienable Employee Options should not work to American General's detriment. Allowing American General to recover damages would therefore not constitute a windfall, despite the fact that the employee option holders were not actually able to receive any financial benefit from their options.

## X

■ Defendants' final attack on American General's damage claim is that American General failed to mitigate its damages. Defendants have submitted elaborate schemes providing for the purchase of "put" and "call" options on Texas Air stock that they contend would have allowed

American General to have "locked in" the profit it is now claiming as damages.

■ The investment alternatives that defendants claim American General should have pursued in order to mitigate its damages are very high risk propositions. Indeed, they appear to be contrary to Texas regulations regarding the types of investments a Texas insurance company such as American General could have made. *See* TEX.INS.CODE ANN. art. 3.39–2 (Vernon Supp.1991); *see also* TEX.ADMIN.CODE tit. 28, § 71103 (1988). While there is a general duty to mitigate damages if it is feasible to do so, a plaintiff need not take unreasonably speculative steps to meet that duty. *Edward M. Crough, Inc. v. Department of General Services of District of Columbia*, D.C.App., 572 A.2d 457 (1990) (duty to mitigate damages with reasonable effort and without substantial risk of loss). American General was therefore not under a duty to engage in the put and call option scenarios set forth by defendants.

## XI

As was noted above, the appropriate measure of American General's damages is the difference between what the value of the warrants with the option attached would have been on the date of the stockholder meeting (May 20, 1987) or their highest intermediate value during a reasonable period after the meeting if the defendants had not breached the warrants, and the actual value of the warrants on that date in light of defendants' breach (that is the value of the warrants without the option attached).

American General has put forth two alternative measures of the value of the warrants in May, 1987 if the right to the option had been certain: (1) the "highest intermediate value"; and (2) the lost profits from a hypothetical short sale of Texas Air stock.

■ American General's second theory of valuing the warrants with the option attached, based on a "short sale" of Texas Air stock, is too speculative to support a damage award. "Short sales" are similar

to "put" and "call" options in that they involve risk that the market price of the stock could fluctuate enough to make the whole investment plan unprofitable. It seems very unlikely that a regulated insurance corporation such as American General would (or even could) engage in short sales of the magnitude suggested by the expert testimony presented at trial.

An award of damages may not be based on "speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). Because the concept of American General's "short selling" of stock is mere speculation at best, it is an inappropriate valuation method to use in the computation of the damages suffered due to defendants' breach.

## XII

As previously indicated, the Court finds that the critical date for determining the amount of damages is May 20, 1987, the date the options were approved by the stockholders, and not February 6, 1987, the date of the merger.

Based on this assumption, American General urges a valuation of the warrants with the option attached based on a $39.625 per Texas Air share trading price. It asserts that this figure is the "highest intermediate value" within a reasonable time after the May 20, 1987 stockholder vote. This trading price was reached on May 29, 1987. American General further asserts that the trading price must be reduced by the 15% discount that American General's expert (First Boston Corporation) claims it would have required had it been the purchaser of the warrants. Although the discount figure seems unusually low, no contrary evidence was presented. Plaintiff further asserts that the discounted trading price must be multiplied by the option ratio (the presumed return of the $16.50 consideration divided by the per full share exercise price of $20.625). The warrant exercise

price ($8.30) then must be subtracted, and the resulting figure multiplied by the number of warrants (5,120,482) to which American General was entitled. Under this calculation, the value of the warrants with the option attached on May 29, 1987 would be $95,471,387 as appears in Chart 1 as submitted by plaintiffs:

#### CHART 1
##### VALUE OF WARRANTS AT 15% DISCOUNT

|   |   |   |
|---|---|---|
|   | $39.625 | STOCK PRICE |
| × | .85 | 15% DISCOUNT |
| = | $33.68 |   |
| × | .8 | OPTION RATIO |
| = | $26.95 |   |
| − | $8.30 | WARRANT EXERCISE PRICE |
| = | $18.65 | VALUE PER WARRANT |
| × | 5,120,482 | WARRANTS |
| = | $95,471,387 | VALUE OF WARRANTS WITH OPTION ON MAY 29, 1987 |

In order to reach the value of the warrants without the option attached, American General urges that the $16.50 merger consideration be the starting point. From that figure American General subtracts the warrant exercise price ($8.30). The resulting figure, $8.20, is then multiplied by the number of warrants held by American General, setting the value of the warrants without the option on May 29, 1987 at $41,987,952 as appears in Chart 2 as submitted by plaintiffs:

#### CHART 2
##### VALUE OF WARRANTS WITHOUT OPTION

|   |   |   |
|---|---|---|
|   | $16.50 | FREEZE-OUT CONSIDERATION |
| − | $8.30 | WARRANT EXERCISE PRICE |
| = | $8.20 | VALUE PER WARRANT |
| × | 5,120,482 | WARRANTS |
| = | $41,987,952 | VALUE OF WARRANTS WITHOUT OPTION ON MAY 29, 1987 AND VALUE TODAY |

Finally, American General calculates the difference between the two values as $53,483,435 (see Chart 3 below). This is the damage award to which American General claims it is entitled if May 29, 1987 is used as the date for determining the amount of damages.

#### CHART 3
##### LOST VALUE OF WARRANTS

|   |   |   |
|---|---|---|
|   | $95,471,387 | 1987 VALUE WITH OPTION |
| − | $41,987,952 | VALUE WITHOUT OPTION |
| = | $53,483,435 | LOST VALUE OF WARRANTS |

## XIII

■ There is, however, a deficiency in American General's calculations. American General erroneously chose May 29, 1987 as the date from which to measure the value of the warrants with the option attached based on that date being the "highest intermediate value". The use of the "highest intermediate value" in the computation of damages is "a compromise attempt to value the chance that the plaintiff might at some time have profited by a rise in value." McCORMICK, *Damages* § 48 (1971). This is not to say, however, that a plaintiff may pick and choose, with hindsight, a single date to set that value. Rather, the date should be established by resort to a "constructive replacement" purchase by the plaintiff, *i.e.,* how long it would have taken the plaintiff to replace the securities on the open market. *Id.* *See also Madison Fund, Inc. v. Charter Co.,* S.D.N.Y., 427 F.Supp. 597, 609 (1977).

■ At first glance nine days after the breach might seem to be a "reasonable time" for a constructive "replacement". American General knew before the stockholder meeting was held, however, that defendants had no intention of making American General eligible for the Employee Option. It also certainly knew that it was not made eligible to receive the options as of the day the vote took place. It therefore would have been prepared to proceed to replace its shares immediately thereafter if it had desired to do so.

American General has not offered any evidence regarding how long it would have taken it to purchase "replacement" shares of Texas Air stock. It seems highly unlikely that a buyer with American General's resources and financial means would have needed nine days to purchase the stock, thereby making the choice of May 29, 1987 arbitrary. Not surprisingly, the $39.625 trading price on May 29, 1987 was the highest trading price Texas Air stock reached after May 20, 1987.

Because it is not feasible to ascertain precisely how long it would have taken American General to purchase such a large block of Texas Air stock, the better "replacement" value to use in the computation would be the trading price on May 20, 1987. The appropriate stock price to begin the computation of the value of the warrants is therefore $37.125 per Texas Air share.

After substituting May 20, 1987's trading price of $37.125 for May 29, 1987's $39.625 trading price in American General's damage calculation, the Court finds that the damage award is $44,804,218.

## XIV

American General also claims that it should be awarded prejudgment interest on its damages. It argues that such an award should be measured from the date of the breach—February 6, 1987.

■ Prejudgment interest is available in Delaware as a matter of right. *Getty Oil Company, Inc. v. Catalytic, Inc.,* Del.Super., 509 A.2d 1123 (1986). Such interest is normally computed from the date of the breach, *Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818 (1992), but the Court of Chancery "is empowered to grant such relief 'as the facts of a particular case may dictate.'" *Shell Petroleum, Inc. v. Smith,* Del.Supr., 606 A.2d 112 (1992) (quoting *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 714 (1983)); *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796 (1992).

Where the underlying obligation upon which damages are based arises *ex contractu,* the Delaware Supreme Court has held that the court should look to the contract itself to determine when the right to prejudgment interest should begin to accrue. *Citadel Holding Corp.,* 603 A.2d at 826.

■ American General is therefore entitled to prejudgment interest measured from the date on which its damages began to accrue—May 20, 1987. The date of the

breach, February 6, 1987, is not the appropriate starting point for the computation of interest because until the Texas Air stockholders made the Employee Option "issued or payable" as required by the language of the warrants provision in the Loan Agreement, American General was not entitled to be issued the options.

■ American General's claim for damages is legal, rather than equitable, in nature and therefore the legal interest rate found in 6 *Del.C.* § 2301 is the appropriate standard to be applied. 6 *Del.C.* § 2301(a) provides that "[w]here there is no expressed contractual rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate...." The appropriate interest rate to be applied to American General's damage award is 5% over the Federal Reserve discount rate applicable on May 20, 1987—the date on which its damages and right to prejudgment interest began to accrue.

### XV

In summary, the breach of American General's contractual right to receive the contingent options occurred on February 6, 1987, the date of the merger, because defendants failed to make American General eligible for the same merger consideration that the employee stockholders were granted. American General's damages should not be measured from the date of the breach, however, because its rights are contractual and the contract upon which they are based provided that it would receive only that which the employees became entitled to receive. The Employee Option was not "issued or payable" until the Texas Air stockholders approved it. American General is therefore entitled to a damage award measured from the date on which the Texas Air stockholders approved the Employee Option and thereby made the option issuable or payable—May 20, 1987.

The appropriate measure of American General's damages therefore is the difference between: (1) the value of the warrants with the option attached on May 20, 1987; and (2) the value of the warrants without the option on the same date. American General's damages calculated under this formula are $44,804,218.

American General is also entitled to prejudgment interest at a rate of 5% over the Federal Reserve discount rate applicable on May 20, 1987. The prejudgment interest is to be measured from the date on which American General's damages are measured—May 20, 1987.

IT IS SO ORDERED.