Murtagh, Thomas R., J.
This court (Murphy, J.) issued a decision on October 27, 2004, awarding partial summary judgment as to liability only to Scott McGrath (“Scott”), Christopher McGrath (“Christopher”), and Stephen Howe (“Howe") (collectively, “Counterclaimants”) on their breach of contract counterclaim against counterclaim defendants Sean McG-rath (“Sean”) and David McGrath (“David”) (collectively, “Defendants”). The Counterclaimants now seek to exclude from a trial on damages arising from the Defendants’ breach of contract all evidence concerning the Counterclaimants’ investment history and the mitigation defense. For the following reasons, the Counterclaimants’ motion is DENIED.

BACKGROUND

The following facts are taken primarily from this court’s (Murphy, J.) partial summary judgment decision (“Summary Judgment Decision”) as well as from the documents the parties have submitted in support of their motion and opposition.
In 1995, the father of Christopher, David, Holly, Scott, and Sean McGrath (“McGrath Siblings”) died, and the McGrath Siblings purchased from his estate all of the residential real estate holdings through Collins Investments, LLC (“Collins I”), an entity they formed for the purpose of making this purchase.[3] Among these residential real estate holdings were thirty-four units in Park Village West (“PVW”), a cooperative apartment complex that consists of 252 units and is located in Westborough, Massachusetts. Sean served as PVWs property manager. Through C&S Realty Trust (“C&S”), of which he is the owner, Sean purchased additional units in PVW with the expectation that the other four McGrath Siblings would reimburse him.
The McGrath Siblings were unable to reach an agreement regarding their purchasing interests in the PVW units Sean had purchased through C&S, as well as regarding their compensating Sean for those purchased units. Thereafter, the McGrath Siblings recruited the assistance of a group of three individuals (“Tribunal”) to settle their dispute. In a document dated June 20, 2001, the McGrath Siblings agreed that the Tribunal was formed “to decide the final disposition of the Park Village West Investment.”[4] The Tribunal issued its written decision on or about July 2, 2001[5] (“Tribunal Decision”). The Tribunal Decision “stated that it would ‘serve to provide the definitive governing resolutions going forward for [each sibling’s] investment in [PVW], should [they] choose to participate.’ ” Summary Judgment Decision, at 2 (alterations in original). “It then set forth a payment schedule, via capital calls, to be made to Sean for reimbursement of exactly what he had advanced on behalf of the others to purchase units in PVW.” Id. “Assuming all 5 members [meaning the McGrath Siblings] proceedfed] with their required funding, all 5 [were to] have an equal state in the resulting enterprise.” Tribunal Decision, at 2.
This court (Murphy, J.) recounted the events that followed:
Pursuant to the Tribunal’s [DJecision, three capital calls were made between July 2001 and January 2002, whereby Scott and Chris sent Sean, in total, approximately $670,000 each.[6] Sean accepted the first two payments but rejected the third in the amount of $230,000,[7] claiming it was insufficient, notwithstanding the Tribunal [DJecision. Sean, through counsel, then sent a letter to each of his four siblings, requiring them to send $250,000 to remain invested in PVW, or otherwise Sean would return their first two payments and ‘proceed with *196 out [them].’ When Scott and Chris refused to submit to Sean’s new terms, Sean, Holly and David, on their own, formed a new agreement,[8] dated April 19, 2002.
Summary Judgment Decision, at 3 (footnotes added) (final alteration in original). In June 2002, Sean returned to Christopher and Scott the first and second payments they had made to him, with interest. Howe, Scott’s trustee, deposited Scott’s repayments in an “interest-bearing account.” According to the Defendants, Christopher failed to cash the check Sean sent to him in June 2002; thus, pursuant to Christopher’s request during a late 2003 mediation before J. Owen Todd, Esq., Sean, in December 2003, sent Christopher a check representing the first and second payments with interest added.
Meanwhile, Sean collaborated with the Kargman family (“Kargmans”) to acquire additional units in PVW. By Spring 2001, this collaboration, called Westborough Ventures (“WV”) owned seventy-nine units in PVW. By January 2003, Sean and the Kargmans had consolidated their holdings, creating “PVW Ventures, LLC (“PVWV”). PVWV consisted of the WV units, the units owned by Sean through C&S, and the units owned by the Kargmans through PVI Really Trust; by February 2006, PVWV owned approximately 153 PVW units. The original thirty-four PVW units owned by Collins I are not included in PVWV. "According to the PVWV Operating Agreement, the McGrath related membership interest [in PVWV] is 45.19% and the remaining membership interest in PVWV is held by the Kargman family through PVI Realty." Supplemental Expert Interrogatoiy Response Concerning Pricewaterhouse Coopers, LLP, Exhibit S to Defendant’s Opposition, at 3.
In the Summary Judgment Decision, this court (Murphy, J.) held that the Defendants breached the Tribunal Decision “(w]hen Sean ultimately rejected Chris and Scott’s third set of checks [on or about January 25, 2002], set at the Tribunal’s direction, and refused further compliance with the Tribunal [Decision . . .” Summary Judgment Decision, at 6. The Defendants now argue that the Counterclaimants’ failure to mitigate reduces any damage award to which they are entitled as a result of the Defendants’ breach. The Counterclaimants dispute that they had a duty to mitigate and that, even if they did have a duty to mitigate, evidence of their investment history is irrelevant and would be more prejudicial than probative.
The Defendants claim that alternative transactions existed and that the Counterclaimants failed to take advantage of them with the money from the capital calls that Sean returned to them. In response to interrogatories from the Counterclaimants, the Defendants state that they intend to call as experts Emmet Logue (“Logue”), a real estate appraiser, and Frederic Miller (“Miller”), a Certified Public Accountant (“CPA”) from Pricewaterhouse Coopers, LLP. The Coun-terclaimants intend to call as expert witnesses Carl Jenkins and/or Richard Mackenzie, both of whom are CPAs from B&B. The Counterclaimants expect B&B to testify as to lost profits, meaning what the Coun-terclaimants would have received through December 31, 2005, had they been allowed to participate in the real estate investment, and as to future lost profits, meaning what the Counterclaimants would have received from Januaiy 1, 2006 through December 31, 2016, had they been allowed to participate in the real estate investment.
The Defendants expect that Miller will not only rebut the testimony expected from B&B, the Counterclaimants’ expert, but also testify as to the value of the PVW real estate venture had the McGrath Siblings all participated throughout, using the “actual performance . . .’’of the McGrath interest in PVWV/WV . . . [as] a yardstick by which to measure the proj ected performance Supplemental Expert Interrogatory Response Concerning Pricewaterhouse Coopers, LLP (“Miller Interrogatory”), Exhibit S to Defendant’s Opposition, at 3. The Defendants expect that Logue will testify about PVW’s market value, both as a whole and as condominium units, and about alternative passive real estate investments the Coun-terclaimants could have taken advantage of in order to minimize their losses from the breach.
With respect to alternative real estate investments, Logue is expected to testify that “in and after January 2002, there were other passive, real estate investment vehicles in which the returned capital could have been invested . . .” Supplemental Answer to Scott McGrath’s Expert Interrogatoiy (“Logue Interrogatoiy”), Exhibit K to Defendants’ Opposition, at 4. Logue reviewed the published rates of return for alternative real estate vehicles, such as Real Estate Investment Funds (“REITs”) and real estate mutual funds. He reviewed and is expected to testify about the published average returns for six specific funds through December 31, 2005:
Vanguard REIT Index Fund - the average annual rate of return is 25.67% over a three-year period, and 18.27% over a five-year period
T. Row Price Real Estate Fund - the average annual rate of return is 28.33% over a three-year period, and 19.38% over a five-year period
Fidelity Real Estate Investment Portfolio - the average annual rate of return is 27.27% over a three-year period, and 19.01% over a five-year period
Third Avenue Real Estate Value Fund - the average annual rate of return is 26.27% over a three-year period, and 19.92% over a five-year period
Wilshire Real Estate Securities Index - the average annual rate of return is 28.13% over a three-year period, and 18.99% over a five-year period
Lipper Real Estate Funds Average - the average annual rate of return is 26.65% over a three-year period, and 18.57% over a five-year period
Id., Exhibit A.
*197 At this point, no other expert is expected to testify to available alternative real estate investments. In its inter-rogatoiy response, however, in the context of calculating lost profits and benefits, B&B intends to calculate the present value of the Counterclaimants’ proportional share of lost profits and benefits by accounting “for the returns that Counterclaimants would have received by investing annual monies they should have received . . . [had they remained part of the investment] from each fiscal year in an Equity REIT the following year.” Counterclaimants’ Supplemental Response to Plaintiffs Expert Interrogatory Propounded on Counterclaimants Concerning Brown & Brown (“B&B Interrogatory”), Exhibit L to Defendants’ Opposition, at 6; see Id. at 9.

DISCUSSION

I. Mitigation

“Courts often invoke the . . . rule of avoidable consequences by saying that the plaintiff must ‘mitigate’ his damages, or even that he is under a ‘duty’ to do so. Tírese locutions are not strictly accurate; they should be understood to mean only that the plaintiffs recovery is reduced to the extent that he unreasonably fails to minimize his damages.” 3 Dan B. Dobbs, Law of Remedies §12.6(2) at 131 (2d ed. 1993). Here, the Defendants argue that the Counterclaimants unreasonably failed to mitigate their damages after Sean returned the money to them.

A. Applicable Law

“The general rule with respect to mitigation of damages is that a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part.” Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982); Restatement (Second) of Contracts §350 cmt. b (1981). A plaintiff must only mitigate if he can do so “without undue risk, burden or humiliation.” Restatement (Second) of Contracts §350(1). A plaintiff need not take steps to mitigate where those steps would cause other serious loss, humiliation, embarrassment, “or loss of honor and respect.” Id. at §350 cmt. g. Additionally, if a party injured by a breach “can save himself from a loss arising from [that] breach ... , at a trifling[9] expense or with reasonable exertions, it is his duty to do it, and he can charge the [breaching party] with such damages only as with reasonable endeavors and expense he could not prevent.” Burnham, 387 Mass. at 586 (footnote added), quoting Warren v. Stoddart, 105 U.S. 224, 229 (1881). A plaintiff, however, need not “make other risky contracts, incur unreasonable expenses or inconvenience or disrupt his business.” Restatement (Second) of Contracts §350 cmt. g.
Thus, the issue of mitigation “frequently involves a determination as to whether the plaintiff acted reasonably under the circumstances . .. What is a reasonable effort to avoid the injurious consequences of a breach is a question of fact.” 24 Williston on Contracts §64:27 at 195 (4th ed. 2002); see 2 Robert L. Dunn, Recovery of Damages for Lost Profits §6.22 at 431 (4th ed. 1992) (“The reasonableness of plaintiffs effort is a question of fact”); see also Koby v. United States, 53 Fed.Cl. 493, 497 (2002) (“[RJeasonable conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented”).
When a parly’s breach consists of a failure to perform in a transaction, as in this case, “it is often possible for the injured party to secure [a] similar [transaction] . . . on the market... In such cases as these, the injured party is expected to make appropriate efforts to avoid loss by arranging a substitute transaction.” Restatement (Second) of Contracts §350 cmt. c. Substitute transactions can be arranged “even if there is no well-established market for the type of performance.” Id. In those situations, “the burden is generally put on the party in breach to show that a substitute transaction was available...” Id. (emphasis added); see American Mech Corp. v. Union Mach Co. of Lynn, 21 Mass.App.Ct. 97, 103 (1985) (“[T]he burden of proving that losses could have been avoided by reasonable efforts rests with the party in breach”); see also Koby, 53 Fed.Cl. at 497 (“[T]he breaching party must show that reasonable possibilities for mitigation existed and were ignored”).
If the party fails to make a reasonable effort to avoid damages by taking advantage of a substitute transaction, “[t]he amount of loss that he could reasonably have avoided by . . . making substitute arrangements or otherwise is simply subtracted from the amount that would otherwise have been recoverable as damages.” Id., §350 cmt. b. “Whether an available alternative transaction is a suitable substitute depends on all the circumstances, including the similarity of the performance and the times and places that they would be rendered.” Id. §350 cmt. e. “If discrepancies can be adequately compensated for in damages, the alternative transaction is regarded as a substitute and such damages are awarded.” Id. At the same time, however, “the fact that the plaintiff did not try to reduce his damages is not important if tiying would have made no difference.” Dobbs, supra.

B. Counterclaimants’ Mitigation

With the Summary Judgment Decision, this court (Murphy, J.) established that the Defendants breached the Tribunal Decision. The general mitigation of damages rule thereby applies, precluding the Counterclaimants for recovering from this breach any amount of loss they reasonably could have avoided. The Defendants have the burden of showing that substitute transactions were available for the Coun-terclaimants reasonably to have taken advantage of in order to minimize their damages. They expect their expert, Logue, will testify at a trial on damages that alternative investment opportunities existed. The Counterclaimants dispute that their damages must be reduced at all, arguing that given the uniqueness of the PVW real estate investment, no alternative or substitute transaction exists and any effort on their part “would have made no difference.” Id.
*198 The Seventh Circuit case of Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986), although an appeal of bifurcated bench trials on liability and damages and distinguishable on its facts, is instructive. In Fishman, the plaintiffs appealed, in part, the lower court’s deduction from plaintiffs’ award of damages, “an amount representing the return [the plaintiffs] would have earned on an alternative, risk-free investment funded by the equity that it did not, as a result of defendants’ conduct, actually invest in purchasing and running the Bulls [the professional basketball franchise the plaintiffs had attempted to purchase].” 807 F.2d at 556. This case involved antitrust issues, but the Seventh Circuit held that the rules regarding mitigation of damages, also referred to by the parties as “plaintiffs opportunity cost[,]” still applied. Id. at 556-57.
“In most cases, a court can determine the amount by which a plaintiffs damages should be reduced by looking to the actual experience of the plaintiff and determining whether the plaintiffs mitigation efforts were reasonable.” Id. at 558 (emphasis added). The plaintiffs in Fishman, however, comprised a small corporation which was created solely to purchase the Bulls and which was not otherwise funded. Id. The plaintiff-organizers[10] of the corporation, therefore, “were able to keep, as a result of the [defendants’] antitrust violation, what would have been their equity contributions to [the corporation].” Id. at 557. As the plaintiffs did not actually do anything with the funds intended to purchase the Bulls, they had no “actual experience” for the court to review, and the court was “forced to hypothesize what [the court] could reasonably expect [the corporation’s] shareholders to have done after [the corporation’s] investment in the Bulls was precluded.” Id, at 558. “Presumably, they invested, or could have invested this money in some other way and received a return on it between 1972 and 1982.”[11] Id. at 557.
Similarly, the Counterclaimants in this case were able to keep, as a result of the Defendants’ breach of the Tribunal Decision, the money that would have been their contributions to the PVW investment. The Counterclaimants did not invest this money and should consequently be required “to account for the ‘passive’ retention ... of their [intended] contribution . . .” Id. The issue in this case, as in Fishman, then becomes whether the injured parties could have reasonably minimized their damages.
While an injured party must reasonably mitigate his damages, “he should not be required to take undue risksf;] ... [at the same time, the court] cannot adopt a measure of opportunity cost which would reward a plaintiff for letting his capital lie fallow while he waited passively for many years to collect his [ Jdamage award.” Id. at 558; see also Koby, 53 Fed.Cl. at 497 (“While reasonable cost-avoiding steps include affirmative efforts to make substitute arrangements compensating for the lack of contract performance, such arrangements need not be entered into if they would expose the party to undue risk or significantly compromise its interests”). Moreover, “the loss of one investment opportunity does not negate the assumption that the capital will seek out some comparable opportunity.” Fishman, 807 F.2d at 558.[12] The Seventh Circuit vacated that part of the district court’s damage award that subtracted $3,600,000 in opportunity costs, an amount that the district court based on the hypothesis that, for the ten-year period at issue, the plaintiffs “put [their] money in the most riskless of all investments, three-month treasuiy bills.” Id, at 549, 559.
In remanding this damages issue to the district court, the Seventh Circuit did not foreclose the use of the treasuiy bill rate altogether; the treasuiy bill rate, however, could not be used “indefinitely” to calculate the plaintiffs’ mitigation. Id. at 559. The court considered the particular circumstances of this case and concluded that the plaintiffs could not have been expected to have made “an alternative equity investment instantaneously. Where, as here, making an equity investment involves making many subjective assessments and possibly elaborate preparations, . .. two or three years would [not] be too long a period of time to allow [the plaintiffs] to identify and structure such an investment.” Id. (footnote omitted); see id. 557 n.34 (“While that [injured] party may have been willing to accept a particular (and perhaps unique) business risk and opportunity, it may not be required, when wrongfully done out of that investment, to invest immediately in another line of business with its own unique configuration of risks”). It is “during this period of searching for and identifying alternative equity investments . . . [that] leaving the money in treasury bills would seem appropriate.” Id. at 559. Thus, the court directed that “[o]n remand an opportunity cost of equity must be established for the period after the initial term when funds could be quite justifiably left in treasuiy bills.” Id. at 560 (emphasis in original).
The Seventh Circuit in Fishman left it up to the district court, on remand, to determine “what alternative equity return should be assumed as an opportunity cost (or investment by way of mitigation) given a preliminary period of several years during which the funds are left in treasuiy bills.” Id. at 559; see id. at 556 (defining opportunity cost of investment as “the return on the most lucrative alternative investment, that is, the return on the ‘next-best investment”). Here, too, the fact finder will have the responsibility of assessing the parties’ evidence regarding the existence of substitute transactions. See, e.g., American Mech. Corp., 21 Mass.App.Ct. at 103 (noting that burden was on defendant at bench trial to present sufficient evidence to establish that plaintiff failed to act reasonably to avoid loss). As noted above, the Seventh Circuit acknowledged the issue of time and of the complexity of the transaction out of which the plaintiffs had been cheated. Fishman, 807 F.2d at 559. Where making an investment involves “many subjective assessments and possibly elaborate preparations, . . . two or three years would [not] be too long a period of time to allow [the plaintiffs] to identify *199 and structure ... an [alternative] investment. Under some circumstances five years might not be too long.” Id.
Logue is expected to testify for the Defendants about the published average returns for certain real estate investment vehicles during the relevant time period. The fact finder in this case may consider the issue of time and the complexity of the investment as well. For example, the fact finder could conclude that the Counterclaimants’ belief that litigation was imminent meant that placing the returned money in an interest-bearing account was a suitable substitute transaction, or that the money should remain available in the event that Sean changed his mind and permitted the Coun-terclaimants to participate in the PVW investment. See, e.g., Boxa v. Vaughn, 674 N.W.2d 306, 312-13 (S.D. 2003) (holding, after trial, that evidence showed that plaintiffs had mitigated where they “exercise[d] diligence to avoid further loss” by filing an action against defendant one month after becoming aware they would incur loss); Restatement (Second) of Contracts §350, cmt. f (noting that injured party “is expected to arrange a suitable transaction within a reasonable time after he learns of the breach [and] the time for performance under the substitute transaction will ordinarily be the same time as it would have been under the original contract”); see also American Gen. Corrp. v. Continental Airlines, 622 A.2d 1, 11 (Del.Ch. 1992) (rejecting, after trial, “elaborate schemes” that defendants argued would have minimized plaintiffs damages as they were “veiy high risk propositions!,”] “unreasonably speculative!,]” and contrary to applicable state “regulations regarding the fypes of investments a[n]... insurance company... could have made”).
Additionally, the Counterclaimants’ expert, B&B, is expected to testify that real estate investment alternatives existed. In its proposed testimony with respect to the Counterclaimants’ lost profits and benefits, B&B notes that it calculated the present value of those lost profits in order “to account for the returns that Coun-terclaimants would have received by investing annual monies they should have received from [the PVW investment] from each fiscal year in an Equity REIT in the following year.” B&B Interrogatory, at 6; see id. at 9. Although B&B’s interrogatory response does not provide any details as to these alternatives, this calculation acknowledges the existence of alternative investment opportunities.
These disputes are for the jury to resolve. The Counterclaimants’ motion to exclude the Defendants’ mitigation defense is therefore DENIED.

C. Lost Volume Investors

The Counterclaimants argue that they are lost volume investors, a status that negates any obligation on their part to attempt to minimize their damages. “If the injured party could and would have entered into the subsequent contract, even if the contract had not been broke, and could have had the benefit of both, he can be said to have ‘lost volume’ and the subsequent transaction is not a substitute for the broken contract.” Restatement (Second) of Contracts §347, cmt. f, see Auto Shine Car Wash Sys., Inc. v. Nice ‘N Clean Car Wash, Inc., 58 Mass.App.Ct. 685, 690, 691 & n.9 (2003) (discussing “lost volume” status in context of sale of goods under Uniform Commercial Code, G.L.c. 106, §2-708(2)); Restatement (Second) of Contracts §350, cmt. d (stating that mere fact of alternative opportunities does not establish avoidance of loss because “[i]f he would have entered into both transactions but for the breach, he has ‘lost volume’ as a result of the breach”). “[I]t is possible!, however,] that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach.” Restatement (Second) of Contracts §347, cmt. f. Therefore, whether a subsequent transaction is actually a substitute for the broken contract such that the injured party’s failure to take advantage of it is unreasonable “raises difficult questions of fact. . . [for the fact finder to] resolve [ ] according to the circumstances of each case.” Id.
The Counterclaimants rely on United Int'l Holdings, Inc. v. The Wharf (Holdings), Limited, 210 F.3d 1207 (10th Cir. 2000), as being nearly identical to this case. There, a jury found that the defendant breached the parties’ agreement that the plaintiff was entitled to a 10% option to invest in the defendant’s project. United Int’l Holdings, Inc., 210 F.3d at 1214, 1219. The defendant argued on appeal that the district court erred in excluding evidence of the plaintiffs alleged failure to mitigate damages. Id. at 1230. The court held that, although the defendant did argue that the plaintiff “could have invested elsewhere the funds intended for investment in the” defendant’s project, the defendant “did not present any evidentiary support that [the plaintiff] failed to mitigate its damages ... [or that the plaintiff] had a substitute investment opportunity.” Id. at 1230-31. Moreover, even if the defendant had presented this evidence regarding mitigation, exclusion still would have been proper “unless [the defendant] also offered evidence that [the plaintiff] could not have accepted both the additional investment opportunity and the . . . investment [in the defendant’s project].” Id. at 1231 (emphasis added).
Here, as established above, the Defendants have offered evidence of alternative investment opportunities of which the Counterclaimants reasonably could have taken advantage. The Counterclaimants counter that, because they unquestioningly had the resources to make a second transaction in addition to the underlying transaction, they would have been entitled to the investment returns of both opportunities. The mere availability of resources, however, does not resolve the mitigation question because as part of that analysis, it is relevant to know whether the Coun-terclaimants ever demonstrated a risk tolerance for multiple real estate investments. Thus, the court will not exclude this evidence as it raises factual questions *200 for the fact finder to resolve. See Restatement (Second) of Contracts §347, cmt. f. The Counterelaimants’ motion is therefore DENIED on these grounds as well.

II. Counterelaimants’ Investment History

Finally, the Counterelaimants seek to exclude evidence of their investment history, arguing that such evidence is irrelevant and would be more prejudicial than probative. This court disagrees. “Whether an available alternative transaction is a suitable substitute depends on all the circumstances, including the similarity of the performance and the times and places they would be rendered.” Restatement (Second) of Contracts, §350 cmt. e (emphasis added). The fact finders’ determination of the reasonableness of the Counterelaimants’ efforts, or lack thereof, to minimize their losses must include a consideration, in part, of whether the alternative investments are reasonable in light of the Counterelaimants’ regular investment practices which, in turn, will necessitate a consideration of the Counterelaimants’ past investment. See, e.g., Fishman, 807 F.2d at 558.[13] Additionally, with respect to the Counterelaimants’ argument that they are lost volume investors, evidence relevant to their investment history is necessary for the fact finders to assess the factual question of whether they would have taken advantage of both the PVW investment and the proposed substitute transactions.
For example, in Makino, U.S.A, Inc. v. Metlife Capital Credit Corp., the defendant-finance company argued that it was unreasonable for the plaintiff-seller to have failed to mitigate its damages by refusing to cash a check for the cost of equipment that a third party, to whom the defendant had disbursed the purchase price, sent to the plaintiff. 25 Mass.App.Ct. 302, 319 (1988). The court held that “(t]he standard of what is reasonable may shift when prior experience with a person makes a mitigating act seem risky.” Id. at 319. Thus, the jury could take into consideration the facts that the third party’s “general credit history with [the plaintiff] did not inspire confidence[,]” and that the check could bounce, leading to “a merry chase for the balance of the sales price .. .” Id.
Although the facts in this case are distinguishable from those in Makino, U.S.A, Inc., the court’s holding that the reasonableness of mitigation efforts can depend on the injured party’s past experiences is consistent with the Restatement’s advice that the suitability of an alternative transaction depends on all the circumstances. See id.; Restatement (Second) of Contracts §350 cmt. e; see also Fishman, 807 F.2d at 558. The Defendants are therefore not precluded from presenting to the jury evidence of the Counterelaimants’ investment history in support of their mitigation defense. Accordingly, the Counterelaimants’ motion is DENIED as to this issue as well.

ORDER

For the foregoing reasons, the Counterelaimants’ motion to exclude all evidence concerning their investment history and the Defendants’ mitigation defense is DENIED.

In February 1999, Scott McGrath transferred his share of Collins I to the Willcare MIM Trust, which he created for the benefit of his children. Counterclaimant Stephen Howe is the trustee of the Willcare MIM Trust.

This proposed investment was to be called "Collins II,” and the Tribunal’s decision was to set out its terms; the Defendants’ opposition to the Counterelaimants’ motion suggests that the McGrath Siblings considered forming Collins II, but they could not resolve their disputes, so they turned to the Tribunal.

There is some uncertainty as to this date based on the documents the parties have provided to the court, but, given Judge Murphy’s decision, this court accepts the July 2, 2001, date as the date the Tribunal issued its decision.

Christopher and Scott each sent Sean $340,000 in July 2001, $101,000 in August 2001, and approximately $230,000 in January 2002.

Sean sent back these two payments of approximately $230,000 to Christopher and Scott on January 25, 2002, the same day on which the Tribunal resigned.

Presumably, this “new agreement” was Woodbridge Investment, LLC.

The term “trifling” in this context “means a sum which is trifling in comparison with the consequential damages which the plaintiff is seeking to recover in the particular case.” Id., quoting Bear Cat Mining Co. v. Grasselli Chem. Co., 247 F. 286, 288 (8th Cir. 1917).

More accurately, the plaintiff in Fishmanwas the corporation that was never funded and was “never . . . more than an empty shell.” Id. at 557. The corporation’s “organizers were able to keep, as a result of the antitrust violation, what would have been their equity contributions to” the corporation. Id. The Seventh Circuit approved of the district court’s having “ ‘pierced’ the corporate veil at least so far as to account for the ‘passive’ retention by the . . . investors of their of contribution over ten years.” Id.

The plaintiffs’ damages were calculated for the period of 1972 through 1982 presumably because the wrongful conduct occurred in 1972, and the district court rendered its decision on liability in late 1981. See id. at 547.

The Seventh Circuit’s discussion of comparable transactions arises in the context of the fair market value of the Bulls. Id. at 548-49. The district court held that the plaintiffs’ damages were to consist of their “lost financial gain, which could be computed by determining the net value of [the defendants’] assets on May 31, 1982 (i.e., the fair market value or going concern value of the assets minus all liabilities) and then subtracting the net contributions made to [the defendant] by its shareholders.” Id. at 548. Tie determination of the fair market value of the Bulls in 1982 “was accomplished by looking at recent sales prices of ‘comparable’ NBA franchises.” Id. “Factors making franchises ‘comparable’ included: (1) the size of the home city; (2) the degree of population growth in the home city; (3) the city’s interest in basketball; and (4) whether the franchise was an ‘expansion’ franchise.” Id. at 548 n.24.

The court in Fishmanwas willing to consider the injured party’s “actual experience ... [to determine] whether the .. . mitigation efforts were reasonable.” 807 F.2d at 558. The facts in that case, however, precluded the court from doing so. Id. Presumably, had the plaintiff had an investment history, the court would have included it in its assessment. See id.