**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| WHITESTONE REIT OPERATING PARTNERSHIP, L.P., a Delaware limited partnership,<br><br>        Plaintiff,<br><br>  v.<br><br>PILLARSTONE CAPITAL REIT, a Maryland real estate investment trust,<br><br>        Defendant. | C.A. No. 2022-0607-LWW |

## MEMORANDUM OPINION

Date Submitted: October 18, 2023
Date Decided: January 25, 2024

Richard P. Rollo, Travis S. Hunter, John M. O'Toole & Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Plaintiff Whitestone REIT Operating Partnership, L.P.*

Christopher P. Simon & David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; Thomas R. Ajamie & Eric P. Chenoweth, AJAMIE LLP, New York, New York; Mike O'Brien, MIKE O'BRIEN P.C., Houston, Texas; *Counsel for Defendant Pillarstone Capital REIT*

**WILL, Vice Chancellor**

This case concerns the adoption of a "poison pill" to frustrate a redemption right in the alternative entity context.

In December 2016, Whitestone REIT Operating Partnership, L.P. and Pillarstone Capital REIT negotiated an agreement through which Whitestone contributed real estate assets to a limited partnership. Whitestone received 80% of the partnership units, which it had the right to unilaterally redeem under the terms of the limited partnership agreement. If Whitestone were to exercise its redemption right, Pillarstone (as general partner) has the discretion to assume and satisfy the redemption through cash or Pillarstone equity.

In late 2021, Pillarstone learned that Whitestone might redeem its investment. In response, Pillarstone adopted an unusual shareholder rights plan to deter a redemption and protect itself. The rights plan had the desired outcome: Whitestone feared negative economic consequences if it served a notice of redemption. Instead of redeeming, it pursued litigation.

After trial, I conclude that Pillarstone's adoption of the rights plan breached the implied covenant of good faith and fair dealing. The limited partnership agreement provides Whitestone with an express right to exit its investment by tendering a notice of redemption. An obvious corollary of that provision is that Pillarstone will not thwart Whitestone's exercise of the right. Pillarstone's actions deprive Whitestone of the fruits of its bargain.

1

Judgment is entered in Whitestone's favor on this claim. The rights plan is unenforceable as to Whitestone. Whitestone may proceed to serve a notice of redemption for some or all of its units without fear of damaging repercussions.

## I.   FACTUAL BACKGROUND

Unless otherwise noted, the following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1] Trial was held over two days during which four fact witnesses and one expert witness testified live.[2] The trial record includes 131 exhibits and 9 deposition transcripts.[3]

### A.   The Property Contribution

In 2016, plaintiff Whitestone REIT Operating Partnership, L.P. ("Whitestone") and defendant Pillarstone Capital REIT ("Pillarstone") negotiated a transfer of certain Whitestone properties to Pillarstone Capital REIT Operating Partnership L.P. (the "Partnership").[4] Whitestone is a Delaware limited partnership through which its general partner—non-party Whitestone REIT—conducts real

---

[1] Pre-trial Stipulation and Order (Dkt. 173) ("PTO").

[2] Dkts. 186-88.

[3] *See* Dkt. 186. Facts drawn from trial exhibits jointly submitted by the parties are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX__" unless otherwise defined. Trial testimony is cited as "[Name] Tr." Deposition transcripts are cited as "[Name] Dep." To the extent that conflicting evidence was presented, I have weighed it and made findings of fact accordingly.

[4] *See* JX 5 ("Contribution Agreement"); PTO ¶ II.7; Dee Tr. 104-05.

2

estate operations and activities.[5]  Pillarstone is a Maryland REIT and the general partner of the Partnership.[6]  The Partnership, a Delaware limited partnership, was formed in September 2016 to facilitate Whitestone's contribution and act as a holding company.[7]  Its only partners are Pillarstone and Whitestone.[8]

On December 8, 2016, Whitestone, Pillarstone, and the Partnership entered into a Contribution Agreement.[9]  Whitestone contributed to the Partnership 14 commercial properties in Texas with a fair market value of approximately $84 million.[10]  The Partnership assumed debt related to those properties of approximately $65 million.[11]  Whitestone received 13,591,764 Class A Partnership units ("Units") for the $18 million difference.[12]  The Contribution Agreement provided that "during any period in which [Pillarstone] is not taxed as a real estate investment trust . . . [it] shall not issue [common shares] to [Whitestone] upon redemption of . . . Units in an amount that would cause [Whitestone] to own in excess of 10% of the outstanding"

---

[5] PTO ¶ II.1.

[6] *Id.* ¶ II.2.

[7] *Id.* ¶ II.4.

[8] JX 4 ("LPA") at Ex. A; Chookaszian Tr. 220.

[9] PTO ¶ II.7; *see generally* Contribution Agreement.

[10] Contribution Agreement § 2.2(a); *see also id.* at Schedule 2.1; PTO ¶ II.4.

[11] Dee Tr. 104-05.  This assumed debt included Whitestone's existing mortgage debt plus additional indebtedness to Whitestone.  *See* Contribution Agreement at Schedule 2.2; *id.* §§ 2.2(b)(i)-(ii), 10.1.

[12] Contribution Agreement § 10.1.

Pillarstone common shares.[13] Pillarstone has never qualified nor elected to be taxed as a REIT for U.S. federal tax purposes.[14]

In connection with Whitestone's contribution of properties to the Partnership, Whitestone and Pillarstone entered into an Amended and Restated Agreement of Limited Partnership of the Pillarstone Capital REIT Operating Partnership L.P. (the "LP Agreement").[15] The LP Agreement governs the relationship between Whitestone and Pillarstone. Exhibit A to the LP Agreement reflects that Whitestone owns 81.4% of the outstanding interests in the Partnership, with Pillarstone holding the remaining 18.6%.[16] As General Partner, Pillarstone has exclusive control over the Partnership's operations.[17]

Section 8.6 of the LP Agreement grants Whitestone a right to unilaterally exit its investment by causing the Partnership to redeem its Units, subject to a minimum threshold of 1,000 Units.[18] If Whitestone exercises its redemption right by delivering a Notice of Redemption to the Partnership (with a copy to Pillarstone), Pillarstone is entitled "in its sole and absolute discretion" to assume the redemption

---

[13] *Id.* § 5.3. A similar 10% limitation is found in an OP Unit Purchase Agreement. Verified Compl. (Dkt. 1) ("Compl.") Ex. E. § 4(h).

[14] PTO ¶ II.10.

[15] PTO ¶ II.8; *see generally* LPA.

[16] LPA at Ex. A; *see* PTO ¶¶ II.1-2.

[17] LPA § 7.1(A).

[18] *Id.* § 8.6(A)-(B); *see also* Chookaszian Tr. 220, 310-11; Jassem Tr. 40.

from the Partnership.[19]  If Pillarstone assumes the redemption, Pillarstone as General Partner can decide whether the redemption will be satisfied through cash (a "Cash Amount") or by issuing Pillarstone common shares to Whitestone  (a "Shares Amount").[20]

The LP Agreement defines Cash Amount as the "amount of cash equal to the Value on the Valuation Date of the Shares Amount."[21]  The Shares Amount is the product of the number of Units offered for redemption by a redeeming party multiplied by a conversion factor.[22]  For purposes of Whitestone's redemption right, "Shares" refer to Pillarstone common shares.[23]

## B.     The Separation Negotiations

By late 2020, Whitestone and Pillarstone were considering a separation.[24]  Jim Mastandrea was then the Chief Executive Officer of both Whitestone and

---

[19] LPA § 8.6(C)-(D) (providing that Pillarstone "may, in its sole and absolute discretion . . . elect to . . . assume directly and satisfy a Redemption Right").

[20] *Id.*; *see also id.* § 7.1(A)(21).

[21] *Id.* at Defined Terms. "Value" is the "amount that a holder of one Partnership Unit would receive if each of the assets of the Partnership were to be sold for its fair market value on the Specified Redemption Date, the Partnership were to pay all of its outstanding liabilities, and the remaining proceeds were to be distributed to the Partners." *Id.* The "Specified Redemption Date" means the tenth business day following the "Valuation Date," or the date Pillarstone receives the Notice of Redemption. *Id.*

[22] *Id.* The conversion factor is 1.0. *See id.*

[23] *Id.*

[24] Chookaszian Tr. 220-24; JX 16 at 6.

5

Pillarstone.[25] To address this conflict, each company formed a special committee to negotiate separation terms.[26] Pillarstone director Dennis Chookaszian served as the chair of Pillarstone's special committee, and Jeff Jones led Whitestone's special committee.[27]

A key point of discussion was the value of the Partnership's real estate assets.[28] An October 2020 broker opinion from Jones Lange LaSalle valued the Partnership's eight properties at $73,764,531.[29] Based on this assessment, Pillarstone calculated the value of Whitestone's Units to be approximately $48 million.[30]

Chookaszian and Jones discussed various options to separate the parties, including Whitestone exercising its redemption right.[31] Jones and Mastandrea told Chookaszian that Whitestone did not intend to redeem at that time.[32] Instead, in June

---

[25] Chookaszian Tr. 221; *see* Chookaszian Dep. 40-41, 56, 153, 160.

[26] Chookaszian Tr. 221.

[27] *Id.* at 221-22; *see* JX 18.

[28] Chookaszian Tr. 222; *see* JX 16.

[29] JX 15 at 4; *see also* JX 16 at 6.

[30] JX 16 at 6; *see also* Chookaszian Tr. 223; Jassem Tr. 23; Jassem Dep. 57-58.

[31] Chookaszian Tr. 224-26.

[32] *Id.* at 226; JX 60 at 2.

2021, Whitestone signed a non-binding letter of intent (the "LOI") that contemplated a sale of Whitestone's Units to Pillarstone.[33]

The transaction reflected in the LOI was Chookaszian's construct.[34] Whitestone would receive a fixed $10 million 10-year note at an interest rate of 3% ($3 million total) plus a contingent payment in 10 years based on the net value of the Partnership's properties.[35] Whitestone could potentially receive $49 million by 2031.[36]

Whitestone's General Counsel Peter Tropoli formed a view that the transaction contemplated by the LOI was unfavorable to Whitestone.[37] Among other issues, Tropoli believed that the transaction would result in a significant "write-down" of Whitestone's investment in the Partnership.[38] He told Mastandrea that he believed exercising the redemption right would produce "a far more favorable outcome" for Whitestone.[39] Tropoli's views about the LOI were relayed to

---

[33] JX 26; *see* Chookaszian Tr. 226.

[34] Chookaszian Tr. 227.

[35] JX 26 at 2.

[36] *Id.* at 3.

[37] Tropoli Tr. 364-66.

[38] *Id.* at 365-66.

[39] *Id.* at 366.

Chookaszian around early August 2021.[40] Both Mastandrea and Chookaszian reacted negatively to Tropoli's feedback.[41]

In August 2021, Mastandrea asked John Dee—a Pillarstone director and Whitestone's then-Chief Operating Officer—to draft a resolution for Whitestone's board that would prevent Whitestone from exercising its redemption right.[42] The resolution was Mastandrea's attempt to cause the transaction contemplated by the LOI to close.[43] The Whitestone board rejected the proposed resolution.[44]

## C. The Rights Agreement

Around this time, Pillarstone learned that Whitestone might redeem its Partnership investment.[45] Chookasian began to consider adopting a "shareholder rights plan" in response.[46] Although he lacks legal training, Chookaszian knew about rights plans from serving on other boards and teaching business school classes.[47] He believed that a rights plan would protect Pillarstone "from an adverse

---

[40] *Id.* at 367, 369-70.

[41] *See id.* at 369-70; Chookaszian Dep. 155-56.

[42] Dee Tr. 158-59; *see also* JX 130 at 251, 295.

[43] Dee Tr. 166-67; *see also* JX 130 at 251.

[44] Dee Tr. 162-63; *see also* JX 28 at 5.

[45] Chookaszian Tr. 235-36; *see also* JX 85 ¶¶ 8-9; JX 102 No. 8; JX 36 at 1 (noting that Whitestone "had made statements during the negotiations concerning a separation of . . . Pillarstone and Whitestone . . . that Whitestone . . . may exercise its conversion rights").

[46] Chookaszian Tr. 239-40; *see also* Chookaszian Dep. 36, 154-55; JX 102 No. 9; Jassem Tr. 26-27; Jassem Dep. 90; Dee Tr. 153-55; Dee Dep. 23.

[47] Chookaszian Tr. 320-21.

action by either Whitestone or a third party" by making it "unattractive [for] anybody attempting to convert [or] redeem."[48]

On December 10, 2021, Pillarstone's board convened to consider "a recommendation" from Chookasian about a "shareholder rights plan."[49] Chookaszian relayed that Whitestone "may be working on a transaction that could have implications for Whitestone[']s holding of 81.4% ownership of Pillarstone's operating partnership units . . . which are convertible into Pillarstone's common shares [and] that Whitestone . . . may exercise its conversion rights."[50] "Because of Whitestone[']s disclosure of a consideration of converting the . . . Units," Chookasian "recommended that Pillarstone consider implementing a shareholder rights plan to protect its shareholders."[51]

Chookaszian discussed "several options" with the Pillarstone board, including "a shareholder rights plan, in anticipation of Whitestone . . . potentially converting the . . . Units into [Pillarstone] common shares, which could be detrimental to the shareholders of Pillarstone."[52] Chookaszian proposed that the board form an

---

[48] *Id.* at 262; *see also* Chookaszian Dep. 41.

[49] JX 36 at 1; *see* Chookaszian Tr. 244-46.

[50] JX 36 at 1; *see* Chookaszian Tr. 333. The discussion of Whitestone's "conversion rights" in the December 10, 2021 minutes refers to Whitestone's contractual redemption right. Chookaszian Tr. 246; Chookasian Dep. 62.

[51] JX 36 at 1; Chookaszian Tr. 334.

[52] JX 36 at 3.

independent committee given the dual fiduciaries at Pillarstone and Whitestone.[53]

Pillarstone's board then formed a special committee of Chookaszian and director Kathy Jassem for the purpose of evaluating a "shareholder rights plan."[54]

On December 21, the Pillarstone board met to consider the special committee's recommendations.[55] At the meeting, Chookaszian explained that adopting what the minutes call "the Plan" would provide Pillarstone with "some protection" from Whitestone's potential redemption.[56] Jassem relayed that the special committee felt "the Plan . . . would enhance the ability of both Pillarstone and Whitestone . . . to be fair and equitable in their negotiations to separate [the] two companies."[57]

On December 26, Pillarstone's board met to consider resolutions "for adopting, approving and implementing the proposed Shareholder Rights Plan."[58] Chookaszian and Jassem voted in favor of approving the resolutions.[59] The third

---

[53] *Id.* at 2.

[54] *Id.*

[55] JX 44. A Pillarstone board meeting also occurred on December 11, 2021. The substance of the meeting minutes is redacted. JX 37.

[56] JX 44 at 1; *see also* Chookaszian Tr. 253; Chookasian Dep. 88.

[57] JX 44 at 2. Portions of the relevant discussion are redacted for privilege. *Id.*

[58] JX 46 at 1; *see* Chookaszian Dep. 97.

[59] JX 46 at 1.

member of Pillarstone's board—Paul Lambert—abstained "due to his service on the board of trustees of Whitestone."[60]

Pillarstone and American Stock Transfer & Trust Company LLC, as rights agent, subsequently executed a Rights Agreement dated as of December 27, 2021.[61] The Rights Agreement provides that dilution will follow the occurrence of a "Triggering Event," including an "Acquiring Person" becoming the "Beneficial Owner of 5% or more of [Pillarstone's] Common Shares then outstanding."[62] This potential dilution creates an economic disincentive for Whitestone to redeem its Units.[63] By delaying Whitestone's redemption, the Rights Agreement allowed Pillarstone to "buy time" and improve its leverage in separation negotiations.[64]

Chookaszian told Whitestone director Jones about the Rights Agreement.[65] Pillarstone's December 30 board minutes reflect that Chookaszian reportedly told Jones the "Plan was filed to protect the Pillarstone minority shareholders and was

---

[60] JX 46; *see* Chookaszian Tr. 254-55.

[61] JX 48 ("Rights Agreement").

[62] *Id.* § 1(a); *see id.* § 1(c)(iv). There are currently 657,084 Pillarstone common shares outstanding. PTO ¶ II.3.

[63] Dee Tr. 179; Chookaszian Tr. 260, 266; *see also* Chookaszian Dep. 65-66, 69, 83, 90-91, 99-101, 104-07; Jassem Tr. 42, 55-56; Jassem Dep. 100, 130-31; Dee Dep. 66-67.

[64] Chookaszian Tr. 262, 271-72; *see also* Chookaszian Dep. 66, 92, 94, 99, 128.

[65] JX 51 at 1.

intended to allow the parties to have the time to reach a fair resolution for all parties."[66]

Chookaszian similarly told Whitestone's then-CEO Dave Holeman that Pillarstone adopted the Rights Agreement to cause Whitestone to negotiate a separation preferable to Pillarstone.[67] Chookaszian suggested to Holeman that Pillarstone would consider selling the Partnership properties—an outcome that Whitestone favored.[68] But in July 2022, Chookaszian informed Holeman that Pillarstone would not agree to a sale.[69]

### D.     This Litigation

Whitestone concluded that it could not tender a Notice of Redemption without triggering the Rights Agreement.[70] It turned to litigation.

On July 8, 2022, Whitestone filed a Verified Complaint in this court advancing three claims against Pillarstone.[71] Count I is a claim for breach of the LP Agreement.[72] Count II is a claim for breach of fiduciary duty.[73] And Count III is a

---

[66] *Id.*; *see* Chookaszian Tr. 272.

[67] Chookaszian Tr. 301-02.

[68] *Id.*

[69] *Id.* at 302; Chookaszian Dep. 70-73.

[70] *See* Tropoli Tr. 375, 397.

[71] Dkt. 1.

[72] Compl. ¶¶ 84-90.

[73] *Id.* ¶¶ 91-98.

claim for breach of the implied covenant of good faith and fair dealing.[74]  As relief, Whitestone seeks a declaration that the Rights Agreement is unenforceable and an award of damages.[75]  Pillarstone both moved to dismiss and answered the complaint, asserting 13 affirmative defenses.[76]

On July 21, 2022, Whitestone filed a motion to preserve the status quo.[77]  On September 8, I entered a status quo order confirming that Whitestone's redemption right would not be exercised and limiting the non-ordinary course transactions that the Partnership could undertake pending the resolution of this action.[78]  A slew of emergency disputes have arisen since then, causing the court to walk a fine line between ensuring that Pillarstone does not render Whitestone's redemption right illusory while allowing the Partnership's real estate business to function.[79]

Amid these disputes, on December 12, 2022, Pillarstone filed a motion for summary judgment.[80]  Pillarstone's arguments included that it was mathematically

---

[74] *Id.* ¶¶ 99-104.

[75] *See id.* at ¶¶ 105-06.

[76] Dkts. 7, 8.

[77] Dkt. 4.

[78] Status Quo Order (Dkt. 26).

[79] *See* Dkts. 34, 38, 40, 46, 53, 56, 58, 63, 69, 73, 75, 78, 83, 90, 100-01, 116, 125, 127, 198, 200-202.

[80] Dkts. 51-52.

impossible for Whitestone to trigger the Rights Agreement.[81]  I denied the motion

because it was based on an unreasonable reading of the Rights Agreement.[82]

A two-day trial was held from July 17 to July 18, 2023.[83]  Whitestone

subsequently moved to add the Partnership as a defendant for remedial purposes.[84]

Emergency motions to show cause and to enforce the status quo order persisted.[85]

After post-trial briefing and argument, this matter was submitted for decision on

October 18.[86]

## II.    LEGAL ANALYSIS

Whitestone seeks to hold Pillarstone liable for adopting and enforcing the

Rights Agreement under three alternative theories: breach of contract, breach of the

implied covenant of good faith and fair dealing, and breach of fiduciary duty.  To

prevail on any of these claims, Whitestone must prove the claim's elements by a

preponderance of the evidence.[87]  Pillarstone, however, has "the burden to prove

---

[81] *See* Opening Br. in Supp. of Def.'s Mot. for Summ. J. (Dkt. 52) 20.

[82] Tr. of Mar. 3, 2023 Oral Arg. and Rulings of the Ct. (Dkt. 111) 54-55; *see also* Dkt. 99.

[83] Dkt. 186.

[84] Dkt. 194.  That motion is denied.  *See infra* note 164.

[85] Dkts. 198, 200-01.

[86] Dkts. 217, 219.

[87] *See Dieckman v. Regency GP LP*, 2021 WL 537325, at *19 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE).

each element of [its] affirmative defenses by a preponderance of the evidence."[88]

Proof by a preponderance of the evidence means that something is more likely than not.[89]

The bulk of the parties' briefing is spent on Whitestone's breach of contract arguments. Yet I believe that another theory—the implied covenant—is more apt.[90] The parties agreed that, in exchange for Whitestone's contribution of commercial properties to the Partnership, it would receive Units and the right to unilaterally exit its investment by causing the Partnership to redeem the Units. These express terms have the corresponding condition that Pillarstone would not engage in self-interested conduct to frustrate Whitestone's redemption right. The record shows that Pillarstone breached this obligation, causing harm to Whitestone.

Because Whitestone proved that Pillarstone breached the implied covenant of good faith and fair dealing, I need not resolve the remaining contract and fiduciary

---

[88] *TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *21 (Del. Ch. Sept. 11, 2017).

[89] *Taylor v. State*, 748 A.2d 914 (Del. 2000) (TABLE) ("[T]o establish something by a preponderance of the evidence means to prove that something is more likely so than not so.").

[90] Pillarstone argues that Whitestone's implied covenant claim must fail because it amounts to "bootstrapping" of its breach of contract claim. Not so. Whitestone's claim for breach of the implied covenant of good faith and fair dealing was appropriately brought in the alternative to its breach of contract claim. *See Trumbull Radiologists, Inc. v. Premier Imaging TRI Hldgs. LLC*, 2021 WL 5577249, at *6 (Del. Super. Nov. 29, 2021) (explaining that "implied covenant claims can be retained and litigated simultaneously and parallel to breach of contract claims as an alternative form of relief").

duty claims. Whitestone is entitled to one recovery. The Rights Agreement cannot be enforced against Whitestone, which can now freely tender a Notice of Redemption.

## A.  The Implied Covenant of Good Faith and Fair Dealing

"The implied covenant [of good faith and fair dealing] is inherent in all contracts," including limited partnership agreements.[91]  At its core, the implied covenant "embodies the law's expectation that 'each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.'"[92]  It "ensures that parties do not 'frustrat[e] the fruits of the bargain' by acting 'arbitrarily or unreasonably.'"[93]

"The [implied] covenant is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[94]  As such, parties to an agreement can hold one another accountable for violating implied "contract[] terms that are so obvious . . .

---

[91] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022); *see also Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 420, 426 & n.49 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[92] *Sheehan v. Assured P'rs, Inc.,* 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020) (quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006)).

[93] *Baldwin*, 283 A.3d at 1116 (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017)).

[94] *Dunlap v. State Farm Fire and Cas. Co*, 878 A.2d 434, 441 (Del. 2005) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

16

that the drafter would not have needed to include the conditions as express terms in the agreement."[95] "The reasonable expectations of the contracting parties are assessed at the time of contracting."[96]

Still, the implied covenant is "a limited and extraordinary legal remedy" and the existing contract terms control.[97] The implied covenant cannot be used to rewrite an agreement or "rebalanc[e] economic interests after events that could have been anticipated, but were not, that later adversely affected one party to [the] contract."[98] "But when the contract is 'truly silent' about the issue, and the express terms of the partnership agreement naturally imply certain corresponding conditions, [parties] are entitled to have those terms enforced according to the[ir] reasonable expectations . . . at the time of contracting."[99]

Because a claim for breach of the implied covenant is contractual, the elements are those of a breach of contract claim. Whitestone must prove "a specific

---

[95] *Dieckman*, 155 A.3d at 361.

[96] *Id.* at 367.

[97] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010); *see also Dunlap*, 878 A.2d at 441 ("Existing contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document.'" (citation omitted)).

[98] *Baldwin*, 283 A.3d at 1117 (quoting *Oxbow Carbon & Minerals Hldgs., Inc., LLC*, 202 A.3d 482, 507 (Del. 2019)).

[99] *Id.*

implied contractual obligation, a breach of that obligation by [Pillarstone], and resulting damage to [Whitestone]."[100]  I consider each element in turn.

### 1.    The Implied Term

Section 8.6 of the LP Agreement entitles Whitestone to redeem its Units. "[A]t any time on or after" six months of the issuance, it has "the right . . . to require the Partnership to redeem" its Units by delivering a Notice of Redemption.[101] Whitestone can exercise this right "from time to time, without limitation as to frequency, with respect to part or all of the Partnership Units that it owns."[102]  The LP Agreement places few limitations on the exercise of this redemption right.[103]

Whitestone argues that a "Further Action" provision in Section 15.4 of the LP Agreement should be read to limit Pillarstone's conduct vis-à-vis Whitestone's redemption right.[104]  Section 15.4 states: "The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of [the LP] Agreement."[105]  This is

---

[100] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (citing *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[101] LPA § 8.6(A)-(B).

[102] *Id.*

[103] The limitations include a minimum redemption of at least 1,000 Units as well as general compliance with applicable legal requirements.  *See id.*; *see also id.* § 8.6(E).

[104] *See* Pl.'s Post-trial Opening Br. (Dkt. 193) ("Pl.'s Opening Br.") 48.

[105] LPA § 15.4.

a boilerplate clause often found in contracts governing real property transactions.[106] It does not expressly pertain to a redemption of Units.

But the plain terms of Section 8.6 imply a corresponding condition: that Pillarstone will not frustrate Whitestone's redemption right. Whitestone's right to redeem is largely unrestricted. The bargained-for terms of the LP Agreement provide that Whitehouse can redeem "at any time" and "without limitation as to frequency."[107] An explicit term preventing Pillarstone from undertaking self-interested actions to impede Whitestone from redeeming was unnecessary.[108] "Partnership agreement drafters, whether drafting on their own, or sitting across the table in a competitive negotiation, do not include [such] obvious and provocative conditions in an agreement . . . ."[109]

---

[106] *See Liberty Prop. L.P. v. 25 Mass. Ave. Prop. LLC*, 2009 WL 224904, at *7 n.29 (Del. Ch. Jan. 22, 2009) ("Many model forms and practice guides for real property transactions recommend the inclusion of a further assurances clause, usually as a 'miscellaneous' or 'general' provision, that obligates the parties to take what reasonable further action may be necessary to complete the transactions contemplated by the agreement or to carry out the agreement's purpose." (citing forms and practice guides)).

[107] LPA § 8.6(A)-(B).

[108] *See Dieckman*, 155 A.3d at 361, 368 (concluding "a requirement that the general partner not engage in misleading or deceptive conduct to obtain safe harbor approvals" was "so obvious" that the parties would not have contracted for it); *In re CVR Refining, LP Unitholder Litig.*, 2020 WL 506680, at *15 (Del. Ch. Jan. 31, 2020) (implying a term in a limited partnership agreement requiring a general partner not to "subvert price-protection mechanisms" for limited partners).

[109] *Dieckman*, 155 A.3d at 368; *see also Intermec IP Corp. v. TransCore, LP*, 2023 WL 5661585, at *15 (Del. Super. Aug. 23, 2023) (finding post-trial that the implied covenant was implicated in a contract where the issue was "not discussed at all" at the time of

Further, nothing in the record indicates that the parties anticipated at the time of contracting that Pillarstone might adopt a rights plan to impair Whitestone's exercise of its redemption right. The LP Agreement was negotiated to reflect that Whitestone could tender a Notice of Redemption at its option. Whitestone reasonably expected that it could do so without penalty.[110] It was not until years later that Pillarstone contemplated a rights plan, which Whitestone first learned about in late December 2021.[111]

Chookaszian believes that Whitestone could have bargained for greater protections in the LP Agreement because "any person with governance knowledge" knows that "shareholder rights plans . . . could exist."[112] I suppose that the drafters might have had some general awareness of poison pills as a defensive mechanism.[113] The Rights Agreement, however, is a different beast. It is intended to mitigate a general partner's financial fallout caused by a limited partner's exercise of a

---

contracting but was an "obvious" term that did not "change any bargained-for protections").

[110] *See* Pl.'s Opening Br. 54-55. Pillarstone's post-trial answering brief leaves unrefuted Whitestone's argument that the LP Agreement drafters did not consider that Pillarstone might adopt a rights agreement to frustrate Whitestone's redemption rights, among other arguments. *See* Def.'s Post-trial Answering Br. (Dkt. 207) ("Def.'s Answering Br.") 33-34; Pl.'s Post-trial Reply Br. (Dkt. 213) ("Pl.'s Reply Br.") 26; *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived." (citation omitted)).

[111] *See* Tropoli Tr. 372.

[112] Chookaszian Dep. 67.

[113] *See, e.g.*, *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).

20

contractual right to exit its investment in a limited partnership. There is no reason to suspect that Whitestone anticipated this unique turn of events.

### 2. Pillarstone's Breach

Pillarstone's adoption of the Rights Agreement deprives Whitestone of "the fruits of the bargain" reflected in Section 8.6 of the LP Agreement.[114] Pillarstone believed that Whitestone exercising its redemption right would be "to the detriment of," "adverse" to, "potentially be very damaging" to, and "unfair to" Pillarstone.[115] The Rights Agreement was adopted in direct response to Pillarstone learning in August 2021 that Whitestone might redeem its investment in the Partnership.[116] It

---

[114] *Smith v. Scott*, 2021 WL 1592463, at *6 (Del. Ch. Apr. 23, 2021); *see also Nemec*, 991 A.2d at 1126 (stating that the implied covenant applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain"); *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *17 (Del. Ch. Sept. 18, 2014) ("The implied covenant of good faith and fair dealing 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.'" (citation omitted)); *Baldwin*, 283 A.3d at 1120 (explaining the importance of the implied covenant to "protect an agreement's spirit against underhanded tactics that deny a party the fruits of its bargain").

[115] Chookaszian Dep. 37-38, 41, 80; *see* Chookaszian Tr. 262 ("There's an economic disincentive, which is what a rights plan does, and the economic disincentive is there for one very specific reason: to buy time . . . We didn't want [Whitestone] to exercise [its redemption right] . . . .").

[116] *See* Jassem Tr. 26-27; JX 102 No. 8-9; *supra* notes 45-46, 48-49 and accompanying text. Pillarstone advanced 13 affirmative defenses in its answer. Defs.' Answer and Affirmative Defenses (Dkt. 7) ("Answer") at 42-45. They were given little attention in Pillarstone's post-trial briefing. Pillarstone argues that Whitestone's claims fail because rights plans are permitted under Maryland law. Def.'s Answering Br. 37. That has no bearing on whether the Rights Agreement amounts to a breach of the implied covenant of good faith and fair dealing. Pillarstone also invokes an advice of counsel defense to suggest that it cannot be held liable for adopting the Rights Agreement. *See id.* at 38; LPA § 7.9(B).

21

was intended to benefit Pillarstone while impeding Whitestone's right to redeem, thereby averting Pillarstone's obligation to perform.[117]

Pillarstone used the Rights Agreement "to buy time" and "slow things down" to force Whitestone into negotiations more favorable to Pillarstone.[118] By weakening Whitestone's redemption right, Pillarstone could renegotiate Whitestone's exit at a discount. This was not "a fair solution for both parties," as Pillarstone suggests.[119] Rather, it was an effort to undermine Whitestone's ability to invoke Section 8.6 of the LP Agreement. Pillarstone's acts deprived Whitestone of the benefit of its bargain and are contrary "to the scope, purpose, and terms of the parties' contract."[120]

Pillarstone makes two arguments to suggest that its actions were taken in good faith and consistent with the LP Agreement. Neither succeeds.

---

But this defense was not raised in Pillarstone's pleading or identified in responding to relevant interrogatories. *See* Answer at 42-45; JX 104 No. 10. Regardless, Pillarstone did not prove this defense at trial. *Cf. Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1123 (Del. 2022).

[117] *E.g.*, Chookaszian Tr. 271-74; Jassem Tr. 41-42; *see also* Chookaszian Dep. 66, 92, 94, 99, 128; Jassem Dep. 99-100; JX 36 at 3.

[118] *See* Chookaszian Tr. 272, 274.

[119] JX 36 at 3; *see* Chookaszian Tr. 336.

[120] *Gerber*, 67 A.3d at 419.

First, Pillarstone asserts that Whitestone's redemption could "result in a coercive, rushed, and discounted liquidation of partnership assets."[121] In other words, Pillarstone maintains that it was reasonably concerned about a fire sale of the Partnership's properties to fund a redemption.[122] But Chookaszian conceded at trial that Pillarstone could raise the necessary cash to fund a redemption in six to twelve months.[123]

Second, Pillarstone argues that it implemented the Rights Agreement to protect against some perceived takeover threat.[124] The record provides no support for this premise. When the Rights Agreement was adopted, Pillarstone insiders controlled more than 90% of Pillarstone's outstanding common and preferred votes.[125] For that group to be diluted below a majority, Pillarstone would have to issue new stock.[126] But no new Pillarstone shares can be issued without Pillarstone's consent,[127] and no third party (including Whitestone) can force Pillarstone to issue new shares.[128] In addition, because Whitestone can only receive Pillarstone shares

---

[121] Chookaszian Tr. 236; JX 85 at ¶ 8.

[122] Chookaszian Tr. 237.

[123] *Id.*

[124] Def.'s Answering Br. 12; *see* Chookaszian Dep. 41-49, 116; Jassem Tr. 55.

[125] JX 129 at 30; *see also* Chookaszian Dep. 118; Jassem Tr. 27-28; Dee Tr. 181-84.

[126] Dee Tr. 184; Dee Dep. 88-89.

[127] PTO ¶ II.12.

[128] Dee Tr. 184-86; Dee Dep. 89.

in connection with a redemption if Pillarstone elects to satisfy it with a Shares Amount, Pillarstone's consent is effectively required for Whitestone to acquire a Pillarstone stake.[129]  Whitestone is also contractually limited from obtaining more than 10% of Pillarstone's outstanding common shares—an amount insufficient to control Pillarstone.[130]

Pillarstone suggests that a third-party "threat" could arise if Whitestone were to be acquired or transferred its shares to another entity.[131]  But Pillarstone's prior written consent is needed for Whitestone to transfer its Units to a third party.[132]  And even if a third party became the beneficial owner of 35% or more of Whitestone's combined voting power, a change of control would occur under the Contribution Agreement, allowing the Partnership to purchase Whitestone's Units at a discount.[133]  In any event, there is no evidence that a legitimate takeover threat existed.[134]

---

[129] *See* PTO ¶ II.12.

[130] *See id.* ¶ II.11; Chookaszian Tr. 284; *see also* Dee Tr. 186 ("Q.  And issuing 10 percent of the general partner's common shares would not dilute the general partner's trustees, insiders, and executives below a majority.  Right?  A. Yes.").

[131] *See* Def.'s Answering Br. 12.

[132] LPA § 11.3; *see* Chookaszian Tr. 288-90.

[133] *See* Contribution Agreement § 1.1 (defining "Change of Control"); *id.* § 12.10; Chookaszian Tr. 291-92.  Since Whitestone owns 13,591,764 Units, triggering the change of control provision would allow the Partnership to purchase Whitestone's Units for around $18 million—about a third of the recovery Whitestone seeks in this litigation.

[134] Pillarstone's witnesses at trial either speculated or relied on hearsay to support their stated beliefs that a takeover was threatened.  *See* Chookaszian Dep. 116, 118-20, 122-23; Jassem Tr. 28-29; Jassem Dep. 102-03, 138, 140-41; Dee Tr. 186-97; Dee Tr. 80-81, 93-94.  None of Pillarstone's witnesses could explain how a takeover was even possible.

3.    Resulting Damage

The Rights Agreement harmed Whitestone by creating an economic disincentive to Whitestone's exercise of its redemption right. Tropoli emphatically testified that Whitestone would redeem but for the Rights Agreement.[135] Whitestone has yet to send a Notice of Redemption in accordance with the LP Agreement because it fears dilution.[136] These concerns are well founded.

A "Triggering Event" for purposes of the Rights Agreement includes a person becoming the "Beneficial Owner" of at least 5% of Pillarstone's common shares.[137] Although a person is generally deemed a Beneficial Owner of any shares it has the right to obtain under conversion, exchange, or similar rights,[138] the Rights

---

[135] Tropoli Tr. 375. Of course, Whitestone is also currently prevented from redeeming by the Status Quo Order.

[136] *See id.* at 397-98. Pillarstone insists that the Rights Agreement has not harmed Whitestone because Whitestone has never tendered a Notice of Redemption—that is, Whitestone's claim is unripe. Def.'s Answering Br. 18. Delaware courts have rejected similar ripeness arguments. *See Carmody v. Toll Brothers, Inc.*, 723 A.2d 1180, 1188 (Del. Ch. 1998) (denying a motion to dismiss because the plaintiff advanced ripe claims challenging a poison pill that had the "current adverse impact" of preventing the "shareholders' present entitlement to receive and consider" certain corporate actions); *see also Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1072 (Del. Ch. 1985) (recognizing that a rights plan caused harm because it had a "present depressing effect . . . on shareholder interests, regardless of whether the rights are in fact ever triggered"), *aff'd*, 500 A.2d 1346 (Del. 1985).

[137] *See* Rights Agreement § 1(a); *id.* § 11(a)(ii).

[138] *Id.* § 1(c)(iv) (defining "Beneficial Ownership" to include securities "which such Person . . . directly or indirectly, has the right . . . to acquire (whether such right is exercisable . . . immediately or only after the passage of time, upon the satisfaction of conditions . . . upon compliance with regulatory requirements, or otherwise) pursuant to any agreement, arrangement or understanding (whether or not in writing) . . . upon the exercise of

25

Agreement contains an exception directly implicating Whitestone.[139]   Under

Section 1(c)(z) of the Rights Agreement:

> [N]o Partnership Unit Holder shall be deemed the "Beneficial Owner" of . . . any securities which may be issued to such . . . Unit Holder in exchange for such . . . Unit Holder's . . . Units . . . pursuant to the . . . [LP Agreement], unless and until such . . . Unit Holder delivers a Notice of Redemption . . . to the . . . Partnership, at which time such . . . Unit Holder shall be deemed the "Beneficial Owner" of . . . such securities.[140]

Given this provision, before a Notice of Redemption, Whitestone is not considered

a Beneficial Owner of the Pillarstone common shares it could receive via its

redemption right.   But after a Notice of Redemption for *any* number of Units,

Whitestone is considered the Beneficial Owner of *all* Pillarstone common shares it

could obtain through redeeming.[141]

Whitestone owns 13,591,764 Units, which could be exchanged for 13,591,764

Pillarstone common shares (subject to the 10% limitation) if Whitestone were to

---

conversion rights, exchange rights, rights (other than the Rights), warrants or options, or otherwise"); *see infra* note 150 and accompanying text (defining "Right").

[139] *See id.* § 1(c)(z).

[140] *Id.*  A "Partnership Unit Holder" is a partner in the Partnership.  *See id.* § 3(g); PTO ¶ II.1.  "Partnership OP Units" are Units.  Rights Agreement § 3(g).  The "Operating Partnership Agreement" is the LPA.  *Id.* at Ex. C; PTO ¶ II.8.

[141] *See* Rights Agreement § 1(c)(z); Chookaszian Tr. 275-77.  The language of Section 1(c)(z) does not limit "Beneficial Ownership" to just the Pillarstone common shares Whitestone might obtain for the Units it offered for redemption in a Notice of Redemption. *See* Rights Agreement § 1(c)(z).

redeem.[142]  Under Section 1 (c)(z) of the Rights Agreement, if Whitestone delivers

a Notice of Redemption for even a single Unit, it is considered the Beneficial Owner

of 13,591,764 Pillarstone common shares.[143]  These shares are then included in the

calculation of whether Whitestone is an "Acquiring Person" under the Rights

Agreement.[144]  Section 1(c) of the Rights Agreement provides:

> With respect to any Person, for all purposes of this [Rights
> Agreement], any calculation of the number of [Pillarstone]
> Common Shares outstanding at any particular time,
> including for purposes of determining the particular
> percentage of the outstanding [Pillarstone] Common
> Shares of which such Person is the Beneficial Owner, shall
> . . . include the number of Common Shares not outstanding
> at the time of such calculation that such Person is
> otherwise deemed to beneficially own for purposes of this
> [Rights Agreement].[145]

Accordingly, after a Notice of Redemption, Whitestone would be deemed the

Beneficial Owner of about 95% of Pillarstone's common shares then outstanding,

---

[142] *See* LPA at Defined Terms (defining "Shares Amount" to mean the number of Pillarstone common shares determined by multiplying (a) the total Units offered for redemption and (b) the "Conversion Factor"); *id.* (defining "Conversion Factor," which is 1.0); *see also supra* notes 20, 22-23 and accompanying text.

[143] *See supra* notes 140-42 and accompanying text.

[144] Subject to irrelevant exceptions, an "Acquiring Person" is a "Person . . . who . . . is the Beneficial Owner of 5% or more of the [Pillarstone] Common Shares then outstanding." Rights Agreement § 1(a).  "Common Shares when used with reference to [Pillarstone] or without reference, shall mean the common shares of beneficial interest . . . of [Pillarstone]." *Id.* § 1(h).

[145] *Id.* § 1(c).

27

qualifying it as an Acquiring Person under the Rights Agreement.[146] That is true—and the Rights Agreement would be triggered—regardless of whether Pillarstone elected to satisfy Whitestone's redemption through a Cash Amount or a Shares Amount.[147]

This result risks economic harm to Whitestone that is contrary to its expectations under the LP Agreement. Triggering the Rights Agreement "immediately" gives Pillarstone common and preferred shareholders the ability to buy additional common shares,[148] which is a so-called "flip-in" provision.[149] The

---

[146] For example, 657,084 Pillarstone common shares (outstanding before a Notice of Redemption) plus 13,591,764 shares (considered outstanding because of a Notice of Redemption) is 14,248,848; and 13,591,764 divided by 14,248,848 is about 95.4%. For purposes of the 5% calculation, the Pillarstone common shares that existing Pillarstone stockholders might receive under the Rights Agreement are disregarded. *See* Rights Agreement § 1(c)(iv) (providing that "a Person shall not be deemed the "Beneficial Owner" of . . . securities which such Person has the right to acquire upon exercise of Rights at any time prior to the occurrence of a Triggering Event"); *id.* at 1 (defining a "Right").

[147] Whitestone contends that the use of "or" in Section 8.6(C)-(D) of the LPA is conjunctive and permits Pillarstone to satisfy the redemption with a mix of cash and equity. *See* Pl.'s Opening Br. 46. For purposes of this decision, I need not determine whether the LP Agreement permits a mix because the flip-in provision can be triggered regardless. *See infra* notes 154-58 and accompanying text.

[148] Rights Agreement § 11(a)(ii) ("[I]n the event any Person shall become an Acquiring Person, then, immediately upon the occurrence of such event . . . (B) each holder of a Right . . . shall thereafter have the right to receive . . . such number of [Pillarstone] Common Shares as shall equal the result obtained by" a formula provided).

[149] JX 72 at 21 ("Flip-In Trigger. If any person . . . becomes an Acquiring Person, each holder of a Right (other than Rights beneficially owned by an Acquiring Person . . . which Rights will thereupon become null and void) will thereafter have the right to receive upon exercise of a Right that number of [Pillarstone] Common Shares having a market value of two times the Purchase Price.").

28

Rights Agreement gives one common share purchase right (a "Right") to each Pillarstone common share,[150] and ten Rights to each Pillarstone Class C preferred share.[151] There are 2,976,524 total Rights outstanding.[152] The number of Pillarstone common shares each Right holder can purchase is calculated by dividing the "Purchase Price" by 50% of the then-current market price of a common share.[153] The purchase of these shares would reduce the ownership stake Whitestone can obtain in Pillarstone through a redemption and diminish the value of Whitestone's redemption consideration.

Pillarstone insists that, if a Notice of Redemption were to put the flip-in provision in play, Whitestone would be unharmed because a redemption would be satisfied through a Cash Amount.[154] Since Pillarstone is not currently taxed as a

---

[150] *See* Rights Agreement at 1 (defining a "Right" as "a dividend of one preferred share purchase right . . . for each [Pillarstone] Common Shares outstanding"); JX 72 at 32; JX 129 at 30.

[151] JX 72 at 32; JX 129 at 30.

[152] There are 657,084 Pillarstone common shares; 256,636 Series A preferred shares (convertible into 53,610 common shares); and 231,944 Series C preferred shares (convertible into 2,319,440 common shares). JX 72 at 32. 657,084 plus 2,319,440 is 2,976,524.

[153] Rights Agreement § 7(b) (defining "Purchase Price"). The number of additional shares that could be purchased after the flip-in provision is triggered is determined by dividing $7 (subject to adjustment) by 50% of the then-current market price of a Pillarstone common share. *See id.* § 11(a)(ii)(B).

[154] Def.'s Answering Br. 26-27; *see* Jassem Tr. 58. If it were so obvious that a redemption could only be satisfied through a Cash Amount, why would Pillarstone go through the trouble of adopting the Rights Agreement in the first place? And why would Pillarstone consistently refuse to stipulate that it would satisfy a redemption in cash without requiring

REIT, Whitestone cannot acquire more than 10% of Pillarstone's outstanding Common Shares.[155] This limitation would (if enforceable and unwaived) allow Pillarstone to issue as many as 73,009 Pillarstone common shares to Whitestone in the event of a redemption.[156]

The math changes, however, if any Rights were exercised to acquire new Pillarstone common shares in the 30 business days between a Notice of Redemption and satisfaction of a Shares Amount redemption. In that case, the number of Pillarstone common shares available to each Rights holder would increase while the price of these common shares decreased.[157] If the price of Pillarstone common shares were low enough and sufficient Rights were exercised, Pillarstone could satisfy a redemption for all of Whitestone's Units with a Shares Amount without running afoul of the 10% limitation.[158]

---

Whitestone to first send a Notice of Redemption (thereby triggering the Rights Agreement)? *See* Def.'s Answering Br. 27 (explaining that Pillarstone was unwilling to stipulate to this unless Whitestone first sent a Notice of Redemption); JX 125.

[155] *See* PTO ¶¶ II.11-12; Contribution Agreement § 5.3; Compl. Ex. E. § 4(h).

[156] This calculation is based on the 657,084 Pillarstone common shares currently outstanding plus the new shares issued to Whitestone through the exercise of its redemption right. *See* Pl.'s Opening Br. 43 (citing Dkt. 18 at ¶ 11; Dkt. 52 at 16 n.5).

[157] *See* Rights Agreement § 11(a)(ii); Pl.'s Reply Br. Ex. C.

[158] Pillarstone's preadoption modeling of the Rights Agreement estimates that if Pillarstone common shares were priced at $0.34, Whitestone would own about 8.9% of the outstanding common shares if all Rights flipped in. *See* Pl.'s Reply Br. Ex. C. At the time of this decision, the most recent closing price of Pillarstone common shares was $0.02. *See* Pillarstone Capital REIT (PRLE), Yahoo! Finance, https://finance.yahoo.com/quote/prle/ (last visited January 24, 2024).

Setting aside the complexities of the Rights Agreement and the various scenarios that could be implicated by a Notice of Redemption, it is evident that the Rights Agreement harms Whitestone. Whitestone bargained for a nearly unlimited right to redeem, at the time and for the number of Units it unilaterally chose.[159] The Rights Agreement was adopted by Pillarstone to discourage and delay a redemption.[160] The very existence of the Rights Agreement puts in doubt whether Whitestone can exit its investment in the Partnership without suffering negative economic consequences. Whitestone should not be required to expose itself to financial peril to exercise a contractual right (or, alternatively, be deterred from exercising it and forced into separation negotiations on terms benefitting Pillarstone).[161] If it were, Whitestone would be deprived of the bargain it reasonably expected (and negotiated for) in Section 8.6 of the LP Agreement.

## B.      The Appropriate Remedy

Whitestone proved that Pillarstone's adoption of the Rights Agreement amounts to a breach of the implied covenant of good faith and fair dealing that has caused it harm. Whitestone proffers two approaches to expectation damages that

---

[159] *See* LPA § 8.6(A)-(B); *see also supra* note 18 and accompanying text.

[160] *See* Chookaszian Tr. 265-66, 271, 274; Jassem Tr. 42-43.

[161] *See* Chookaszian Tr. 301-02; *see also supra* notes 34-38 and accompanying text.

measure the amount "necessary to put [it] in as good a position as it would have occupied had there been full performance of the contract."[162] The first is monetary damages of $51,200,600 plus interest, reflecting a possible valuation of the Partnership's assets as of December 31, 2021.[163] The second approach asks me to: (1) declare the Rights Agreement unenforceable as to Whitestone or enjoin its enforcement against Whitestone; (2) permit Whitestone to tender a Notice of Redemption; (3) allow Pillarstone to determine the current value of the Partnership's assets; and, as necessary, (4) later enter a monetary judgment against Pillarstone for the difference between the amount Whitestone would have received in or around December 2021 and the current value.[164]

---

[162] *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 8 (Del. Ch. 1992), *aff'd*, 620 A.2d 856 (Del. 1992) (TABLE).

[163] *See* JX 121 at 6.

[164] Pl.'s Opening Br. 64-65; *see* Tr. of Oct. 18, 2023 Post-trial Arg. (Dkt. 219) 49-51. Whitestone acknowledges that it will need to file a separate action should it seek a monetary judgement against the Partnership since the Partnership is not a party to this case. *See* Pl.'s Opening Br. 64-65.

On August 28, 2023, Whitestone filed a motion to amend its complaint under Court of Chancery Rule 15(b) to add the Partnership as a party. Pl.'s Mot. to Conform Pleadings to the Evid. (Dkt. 194). This motion was purportedly in response to Pillarstone's suggestion that the court lacked the authority to grant monetary relief against the Partnership as a non-party. The motion is denied. It would be prejudicial to both the Partnership and Pillarstone to add the Partnership as party after trial. *E.g.*, *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *42 (Del. Ch. Mar. 15, 2023) ("Whether to permit post-trial amendment is a matter for this court's discretion. The primary consideration is 'prejudice to the opposing party.'" (citation omitted)). The Partnership had no opportunity to present a defense and has rights and obligations different from Pillarstone. Regardless, the relief I am granting does not require the Partnership to be joined as a party.

32

The latter approach to a remedy is appropriate. It both addresses the harm to Whitestone caused by the Rights Agreement and maintains the parties' contractual expectations in the LP Agreement. To award $51 million today would require me to find that a hypothetical redemption by Whitestone would have been for all of its Units. It is possible, though, that Whitestone would have redeemed a lesser amount. Awarding money damages would also bypass the provisions of the LP Agreement allowing Pillarstone to decide whether to assume the redemption from the Partnership, whether to satisfy the redemption through a Cash Amount or Shares Amount, and what value to attribute to the Partnership's assets.[165] To preserve the parties' bargain, these steps should be followed in the course set out by the LP Agreement.

Accordingly, the Rights Agreement is declared unenforceable against Whitestone. Whitestone may proceed to tender a Notice of Redemption for the number of Units it chooses, consistent with Section 8.6 of the LP Agreement.[166] The parties must thereafter follow the framework prescribed by the LP Agreement. Any further relief must await future proceedings.

---

[165] *See* LPA § 8.6(A)-(D).

[166] The Status Quo Order is hereby vacated insofar as Whitestone may tender a Notice of Redemption. Under its terms, the remainder of the Status Quo Order will be vacated upon the entry of a final order and judgment.

## III. CONCLUSION

Pillarstone breached the implied covenant of good faith and fair dealing. Judgment on Count III is entered for Whitestone. Counts I and II, which are brought in the alternative to Count III, are moot. The parties shall confer on a proposed final order and judgment to implement this decision and file it within 10 days.